Georgina ROSE, Petitioner,

v.

H. L. WOOLWINE, District Director, Immigration and Naturalization Service, Baltimore, Maryland, Respondent.

No. 9409.

United States Court of Appeals Fourth Circuit.

Decided May 3, 1965.

Marvin Ellin, Baltimore, Md. (William O. Goldstein, Baltimore, Md., on brief), for petitioner.

Kenneth C. Shelver, Atty., Dept. of Justice (Claude V. Spratley, Jr., U. S. Atty., Granville R. Patrick, Asst. U. S. Atty., and Don R. Bennett, Atty., Dept. of Justice, on brief), for respondent.

Before SOBELOFF, Chief Judge, J. SPENCER BELL, Circuit Judge, and MICHIE, District Judge.

SOBELOFF, Chief Judge.

This is a petition for review of a decision of the Board of Immigration Appeals. Petitioner, Georgina Rose, a forty-year-old female alien, first entered the United States in October, 1948, as a non-immigrant visitor. In July, 1956, notified that her visa had expired, she asked to be allowed to depart from this country voluntarily. For the Attorney General to grant such permission he must determine that the alien is of good moral character. 8 U.S.C.A. § 1254(e). See Gordon and Rosenfield, Immigration Law & Procedure 705 (1959). While the Special Inquiry Officer was engaged in determining whether such a finding was warranted several persons volunteered information suggesting that petitioner was morally

delinquent. All but one of these informants later retracted their statements and permission to depart voluntarily was granted.

Petitioner left the United States and proceeded to Cuba where she applied to the American consul for a visa. This was denied when the consul received statements from the former husband and mother-in-law of Mrs. Rose again putting into question petitioner's morals. At no time was she allowed to see the charges made against her or given an opportunity to face and cross-examine her accusers. She underwent an examination by a psychiatrist of her own choosing and received a clean bill of health but this failed to affect the result —the visa was still withheld.

Frustrated, Mrs. Rose then resorted to a desperate alternative. She effected a re-entry into the United States in November, 1957, by falsely representing herself to be an American citizen. On October 28, 1963, she was served with an order to show cause why she should not be deported for entering the United States without an inspection, 8 U.S.C.A. § 1251(a) (2), and failing to file an annual address report, 8 U.S.C.A. §§ 1251 (a) (5), 1305.

At the ensuing deportation hearing, on November 13, 1963, petitioner conceded that she had violated the above-mentioned statutes and was subject to expulsion. She applied for permission to depart voluntarily but this time it was denied, on the ground that such relief was not available to an alien who has failed to file an annual address report. Mrs. Rose was not represented by counsel at this hearing but a "travel agent" did accompany her.

Subsequently, petitioner retained counsel and on December 18, 1963, moved the Special Inquiry Officer to reopen the proceedings so that additional evidence could be presented for consideration. The motion to reopen was denied and an appeal taken to the Board of Immigration Appeals. A short statement presented to the Board set forth two grounds for the appeal:

1. "Petitioner was not represented by counsel at the deportation hearing, but was, instead, accompanied by a 'travel agent' who was not able to pursue an administrative appeal.

2. "Petitioner is aware that her Service file contains certain inflammatory and scandalous data which is untrue; that such data, if unrefuted, would make it impossible for her to re-enter the United States if she is deported; and that the existence of this information unchallenged constitutes prejudicial injury to [petitioner] who is * * * the wife of a native born United States citizen."

In a written opinion the Board dismissed the appeal, taking the view that the alleged existence of false statements in her file had no bearing on her deportability or on the denial of her application for voluntary departure since her deportation order and the denial of the application were based on her own admissions.

A petition for review was then filed in this court under section 106 of the Immigration and Nationality Act of 1952, as amended by section 5(a) of the Act of September 26, 1961, 75 Stat. 651, 8 U.S.C.A. § 1105a (Supp. IV 1962), which provides, in summary, that the courts of appeals are vested with exclusive original jurisdiction to review "final orders of deportation * * * pursuant to administrative proceedings under section 242(b) of [the 1952] Act * * *." The latter section provides that:

"A special inquiry officer shall conduct proceedings under this section to determine the deportability of any alien * * * and, as authorized by the Attorney General, shall make determinations, including orders of deportation." 8 U.S.C.A. § 1252(b).

■■ The decision challenged is that of a Special Inquiry Officer in denying a motion to reopen. The Supreme Court has now held that the denial of a motion

to reopen is reviewable as a "final order of deportation." Giova v. Rosenberg, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964); see also Foti v. Immigration and Naturalization Service, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963). As we interpret these cases, they authorize review of a decision on an issue stemming from a deportation proceeding.

The Service contends that, in this case, the motion to reopen is distinguishable from those considered in the above-cited cases because Mrs. Rose asks only an opportunity to contest the veracity of damaging evidence in her file without questioning her deportability. We must reject this distinction. The issue here presented does in the most substantial way pertain to deportability for it involves the special consequences that will follow from the deportation. If it were a deportation the consequences of which might be readily overcome by an application made to an American consul in a foreign country for readmission to the United States, that would be one thing; but a deportation which carries with it an effective preclusion of re-entry is quite another. The presence in the petitioner's record of uncontested allegations of sexual perversion will effectively foreclose her return to this country. Thus a new dimension is added, since the effect of this order goes beyond that of an ordinary deportation.

In the circumstances presented it would be arbitrary to deny Mrs. Rose a new hearing. She was not represented by counsel at her original hearing and while it is true that verbally she agreed to rely on a "travel agent" instead of professional counsel, she was not aware that this would put out of reach all opportunity to counteract the damaging evidence in her file. Certainly an attorney would have explored every possibility of attacking the statements made by his client's detractors, with a view of safeguarding an opportunity to apply for readmission. In the context of a famous immigration case Justice Douglas wrote:

"We are dealing here with procedural requirements prescribed for the protection of the alien. Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in the land of freedom. That deportation is a penalty —at times a most serious one—cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness." Bridges v. Wixon, 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945).

It would be grossly unfair to shut the door to a proper inquiry now.

The Service frankly acknowledges the injustice of the treatment accorded the petitioner but answers that a Special Inquiry Officer cannot correct it as his only authority is "to determine the deportability of any alien * * *." Section 242(b) of the 1952 Act, 8 U.S. C.A. § 1252(b). We think the Service construes its authority too restrictively. We read "deportability" to include matters affecting the severity of a deportation, and this spirit is reflected elsewhere in the Immigration Act. For example, section 1253(a) makes ameliorative provision for aliens whose deportation would subject them to physical persecution, and section 1254 allows special consideration, even to the suspension of deportation, where it would result in exceptional and extremely unusual hardship to the alien or his spouse, parent or child, who is a citizen, etc.

Judge Learned Hand's comment in a deportation case is instructive here:

"* * * these are consequences whose warrant we may properly scrutinize with some jealousy, and insist that logic shall not take the place of understanding." U. S. ex rel. Mignozzi v. Day, 51 F.2d 1019, 1021 (2d Cir. 1931).

And more recently Justice Stewart has said:

"In this area of the law, involving as it may the equivalent of banish-

ment or exile, we do well to eschew technicalities and fictions and to deal instead with realities." Costello v. Immigration and Naturalization Service, 376 U.S. 120, 131, 84 S.Ct. 580, 587, 11 L.Ed.2d 559 (1964).

The Act, as we have seen, recognizes that more may be at issue in a deportation hearing than the bare question of deportability. Upon the determination of that issue may hang serious consequences which will convert the order of deportation into an effective permanent bar, depriving a person "of all that makes life worth living." Ng Fung Ho v. White, 259 U.S. 276, 284, 42 S.Ct. 492, 495, 66 L.Ed. 938 (1922). It is in the interest of the United States as well as the alien, indeed it is a service to justice, to allow her to present whatever is pertinent to the allegations reasonably thought to be in the file and which may affect her right later to seek a visa for re-entry. To deny her this—her only opportunity to have procedural due process—and to remit her to the discretionary action of a consul who may be directly influenced by matters in the file not subject to attack or refutation in a foreign land, where no United States court sits,[1] casts grave doubt on the constitutional adequacy of the deportation proceedings. Such an interpretation is not to be favored.

We hold that a Special Inquiry Officer is empowered to conduct a hearing in which an alien will be afforded a fair opportunity to impeach the damaging information which has been put in her file. The question of peversion was first raised before a Special Inquiry Officer in the 1956 hearing held to determine whether she could be allowed to leave this country voluntarily. If such an officer has the authority to entertain the question initially he surely has authority to see the issue fully explored.

Ordinarily, if the alien's spouse is an American citizen, a hardship which results from the order of deportation may be overcome by obtaining a visa from an American consul abroad. In the instant case, however, the practical effect of the statements secretly made about the petitioner is to exclude her permanently and to bar a reunion with her American husband and she stands helpless to defend herself against malice or defamation. No shield of protection should be furnished the authors of statements upon which results of such serious character can be predicated.

The oral argument in this court revealed that some of the derogatory information is contained in a file maintained by the State Department in the enforcement of the same Immigration and Nationality Act. This file should be made available before the Special Inquiry Officer for use in a hearing in which the petitioner will be allowed to meet the evidence against her. A record of the hearing should then be attached to all files relevant to Mrs. Rose which are maintained by the Departments of Justice or State. We assume that we are not confronted here with any questions of executive privilege or national security.

Reversed and remanded.

---

1. Rosenfield, "Consular Non-Reviewability: A Case Study in Administrative Absolutism," 41 A.B.A.J. 1109 (1955).