Noe Castillo NUNEZ, et al.,

v.

Hal BOLDIN, et al.

Civ. A. No. B-81-311.

United States District Court,
S. D. Texas,
Brownsville Division.

April 6, 1982.

Lee J. Teran, San Antonio, Tex., Linda Reyna Yanez, Brownsville, Tex., David Hall, Texas Rural Legal Aid, Weslaco, Tex., for petitioners.

Harry Lee Hall, Asst. U. S. Atty., Brownsville, Tex., for respondents.

## MEMORANDUM AND ORDER

VELA, District Judge.

This cause was filed as a class action by four citizens of El Salvador and one citizen of Guatemala against the Immigration and Naturalization Service (INS) and officers thereof, asking for certain injunctive and declaratory relief from various practices and procedures of the INS relating to the detention of citizens of El Salvador and Guatemala at the INS detention facility at Los Fresnos, Texas.

Following a hearing on December 4, 1981, an agreed Temporary Restraining Order was entered and a preliminary injunction hearing ordered for January 5, 1982. On January 5, 1982, the Court issued a Preliminary Injunction on issues regarding access to attorneys and the courts.[1] These matters are incorporated into this Order and shall remain in effect as part of this Preliminary Injunction.

At the time the Preliminary Injunction was entered on January 5, the Court reserved ruling on the issue of the defendants' duty to notify detainees of the right to apply for political asylum. Upon further consideration of that issue, and after having received briefs from the parties, the Court finds that petitioners are entitled to preliminary injunctive relief as to that issue, as is more fully explained below.

## FINDINGS OF FACT

1. Plaintiffs are detainees at the INS detention facility at Los Fresnos, Texas. Petitioners filed this cause as a class action, seeking to represent all citizens and nationals of El Salvador and Guatemala detained at the facility.

2. The Los Fresnos facility is located approximately 20 miles from Brownsville, Texas and 30 miles from Harlingen, Texas.

The facility houses about 250 detainees for processing for deportation, a large number of which are citizens and nationals of El Salvador and Guatemala. While all detainees have the right to a deportation hearing before an immigration judge, a majority of the detainees are returned to their country of origin through voluntary departure. The alien admits to being in the country illegally, chooses the country he wishes to return

---

1. The Preliminary Injunction enjoined defendants, their agents, employees, and all persons acting in concert with them, from:

    1) Failing to make available to detainees at the INS detention facility at Los Fresnos, Texas, pens, pencils, paper and other writing materials and denying prompt access to such materials upon request by such detainees;

    2) Confiscating from persons arrested by defendants any papers, cards, or notes containing the names, addresses or telephone numbers of attorneys, friends, and relatives and failing to immediately return all available such papers, cards and notes which have been previously confiscated;

    3) Reading written materials provided by counsel to detainees at the INS facility at Los Fresnos, Texas, other than a brief inspection of such material to prevent contraband;

    4) Scheduling any legal proceedings (including deportation and voluntary departure) of detainees at the INS detention facility at Los Fresnos, Texas on whose behalf a form G–28, Notice of Appearance of Counsel, has been filed with defendants, without first providing reasonable written or telephonic notice to the attorney of record as indicated by the Last G 28 filed;

    5) Restricting attorney and paralegal visiting hours at the INS detention facility, Los Fresnos, Texas, except as follows: visiting hours shall be from thirty (30) minutes after breakfast until 9:30 p. m. daily, and there may be no visiting thirty (30) minutes before and after lunch and thirty (30) minutes before and after dinner. Defendants are further enjoined from restricting visiting hours in the case of an emergency and with notice by the attorney or paralegal;

    6) Restricting access to detainee clients at the INS detention facility at Los Fresnos, Texas by any paralegals who are United States citizens or lawful permanent residents and who have been designated in writing by a supervisory attorney or other person or organization authorized to represent individuals before the Immigration and Naturalization Service;

    7) Failing to make available to detainees at the INS detention facility at Los Fresnos, Texas a designated location for the purpose of reading legal materials and preparing for deportation proceedings, and failing to make available to such detainees at such designated location, self-help legal materials and sample forms and failing to make available, upon request, additional forms and materials.

to, and is returned without a hearing. He is, however, informed of his right to have a hearing.

3. Although detainees have the right to counsel, they do not have the right to appointed counsel. 8 U.S.C. § 1362. There are no legal clinics in the area available to represent detainees in deportation proceedings. Those wishing to have legal representation must rely on a few private attorneys or, to a limited extent, the services of legal aid attorneys. Access to the facility to paralegals and other voluntary legal assistants has been restricted.

4. Attorneys' visiting hours at the detention facility have been from 8:00 a. m. until 3:30 p. m., except during mealtimes. Visits after 3:30 p. m. have been allowed in special or unusual circumstances.

5. The facility has had no law library, and has prohibited the personal possession by detainees of self-help legal materials, paper and pencils. The INS has now provided some basic self-help legal materials, paper, pencils and forms which are available to the detainees in a central location. All self-help legal materials and forms are in the English language. The voluntary departure form is in both English and Spanish.

6. Papers and other reading materials given detainees by their attorneys have at times been read by detention center personnel. Defendants have not opposed an order whereby such materials will be examined only for contraband and not read.

7. Shakedown searches are periodically conducted at the facility for security reasons. Pieces of paper containing the names, addresses, and telephone numbers of relatives, friends and attorneys have been confiscated. The INS has not objected to an order prohibiting confiscation of papers containing personal information.

8. Attorneys representing alien detainees at the detention facility are required to enter their appearance by filing a form G–28. Filing such notice does not always guarantee that the attorney will receive notice of proceedings in the alien's case, including voluntary departure without a hearing pursuant to the execution of the I–274 form.

9. Defendants do not advise detained aliens prior to voluntary departure nor prior to the issuance of an Order To Show Cause of their right to apply for political asylum. Citizens and nationals of El Salvador detained at the INS facility are predominantly uneducated as to the U. S. legal system, and are not familiar with the rights and procedures established by the Refugee Act of 1980.

## CONCLUSIONS OF LAW

One seeking the extraordinary remedy of a preliminary injunction must make a showing of four requirements:

1. A substantial likelihood that the plaintiffs will prevail on the merits;

2. A substantial threat that plaintiffs will suffer irreparable harm if the injunction is not issued;

3. The threatened injury to plaintiffs outweighs the possible harm of the injunction to the defendants, and

4. Granting the injunction will not be adverse to the public interest. *Canal Authority of Florida v. Callaway*, 489 F.2d 567 (5th Cir. 1974); *Allison v. Froehlke*, 470 F.2d 1123 (5th Cir. 1972). Plaintiffs have met these four requirements.

■ Beginning with *Ex Parte Hull*, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), reasonable access to the courts has been a constitutional imperative. Moreover, prison officials must not only refrain from placing obstacles in the way of communications between prisoners and their attorneys, but are obligated to affirmatively provide prisoners with legal assistance. *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Besides providing reasonable access to attorneys, legal assistance may take the form of access to attorney agents and such other legal resources as law libraries, legal forms, and writing materials. *Bounds v. Smith, supra.*

582

In deciding whether or not a prison is providing reasonable access to legal representatives, a court must strike a balance between the interests of the prisoner and the institution's interests of security and order. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Taylor v. Sterrett*, 532 F.2d 462, 468 (5th Cir. 1976). Nevertheless, restrictions which are not reasonably related to orderly administration cannot stand. *Procunier v. Martinez*, 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974); *Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981); *Taylor v. Sterrett, supra.* In addition, other factors which must be considered are the location of the facility with respect to attorney availability, size of the detainee population to be served, and what, if any, legal assistance is being provided. *Bounds v. Smith*, 430 U.S. 817 at 831, 97 S.Ct. 1491 at 1499, 52 L.Ed.2d 72. The requirement of access to courts and counsel extends to civil matters as well as criminal proceedings. *See Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Although it has been held that deportable aliens do not have the right to appointed counsel under the Sixth Amendment, a violation of the statutory guarantees of counsel is a violation of the Fifth Amendment. *See Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Barthold v. INS*, 517 F.2d 689 (5th Cir. 1975). The courts have consistently recognized the importance of counsel in deportation proceedings. *Rose v. Woolwine*, 344 F.2d 993 (4th Cir. 1965); *Handlovits v. Adcock*, 80 F.Supp. 425, 428 (E.D.Mich. 1948). The United States Court of Appeals for the Fifth Circuit demonstrated this in *Partible v. INS*, 600 F.2d 1094, 1096 (5th Cir. 1979), by remanding a deportation proceeding wherein the respondent had waived counsel without sufficient understanding of the complexities of her situation.

Considering the remoteness of the Los Fresnos detention facility, prohibiting attorneys from visiting with their clients after 3:30 p. m. is unduly restrictive. Any attempt to provide access to counsel in the rural setting of the detention center would have to include evening hours. Another consideration in this decision is the fact that the detention center does not have the same security problems as a jail or prison. Most of the detainees are not "criminals"—their only wrongdoing is having entered this country illegally.

The remote location of the facility also makes it necessary for those attorneys that do represent detainees to be allowed to use designated paralegals and other legal assistants to help them with some of the routine tasks that must be done at the detention center in the course of their representation of their clients. The use of legal assistants is sometimes the only effective way to provide representation under the circumstances. *See Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1977); *Ruiz v. Estelle*, 503 F.Supp. 1265 (S.D.Tex.1980). Legal assistants designated by an attorney must be allowed to visit that attorney's clients without the attorney being present. In the interest of security, however, the INS may limit access to the facility to only those legal assistants that are citizens or legal residents of the United States.

Access to the courts also includes the means to prepare for legal proceedings and to communicate outside the gates of the detention facility. As stated by the Supreme Court in *Bounds v. Smith*, 430 U.S. 817, 824, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72 (1977), it is "indisputable" that prisoners must be provided writing materials. Writing materials should be made available upon request to any inmate at a designated location. Furthermore, the confiscation of writing materials and of personal papers containing the names and addresses of relatives, friends, and attorneys can effectively prevent detainees from preparing for deportation proceedings or avoiding departure without a hearing or preparing an application for asylum.

The reading of a detainee's legal documents and correspondence can amount

to an intimidation of his right to seek legal assistance and to petition the court. Any such intimidation is a violation of fundamental law. *See Taylor v. Sterrett*, 532 F.2d 462 (5th Cir. 1976); *Campbell v. Beto*, 460 F.2d 765 (5th Cir. 1972); *Andrade v. Hauck*, 452 F.2d 1071 (5th Cir. 1971). Legal materials given to detainees by counsel may be briefly inspected for contraband, but may not be read as a matter of course by detention personnel.

■ This case also involved the issue of giving notice to attorneys of proceedings scheduled involving their clients. The Immigration Service provides a form (G–28), which, when filed, notifies the Service that a particular attorney represents a detainee in his case. Regulations require the INS to notify the attorney of record of all proceedings which involve his client. 8 C.F.R. § 292(a). The failure to notify an attorney who has entered his appearance of any proceeding involving his client is a denial of due process. *See, Mendez v. INS*, 563 F.2d 956 (9th Cir. 1977). Consequently, the Immigration Service must give reasonable notice to counsel of all proceedings in their respective cases.

With some exceptions, the aforegoing orders were the result of agreements of the parties with the Court. Although the allegations of plaintiffs did not directly address the physical treatment of the detainees at the Los Fresnos facility, the Court and his staff, at the invitation of defendants, visited the detention center without advance notice and observed the existing conditions. Interviews were conducted with detainees in the Spanish language and outside the presence of immigration officers, and free discussions were encouraged. It is noteworthy to mention that no evidence surfaced which would indicate any form of mistreatment.

The aliens acknowledged that the conduct of the Service personnel was consistent with affording them dignity and respect. Relief from crowded conditions is anticipated as construction of new facilities are near completion.

■ The real issue of controversy for this Court's determination is whether plaintiffs are entitled to temporary injunctive relief requiring defendants to notify members of the alleged class that they have the right to apply for political asylum in the United States. The Court is of the opinion that there is a substantial likelihood of plaintiffs prevailing on the merits as to this claim.

In March of 1980 Congress enacted The Refugee Act of 1980, setting forth a comprehensive system for the admission of refugees into this country. Congress in that Act declared that "it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands. Pub.L. 96–212, 94 Stat. 102 (March 17, 1980).

Indeed, this policy had been recognized by Congress in 1952 when it granted the Attorney General the authority to withhold the deportation of aliens who would be subjected to "physical persecution" if they were deported. Immigration and Nationality Act, Ch. 477, § 243(h), 66 Stat. 212 (1952). The Refugee Act of 1980 amended this section, which now *prohibits* the deportation of aliens to countries where they would face "persecution on account of race, religion, or political opinion." 8 U.S.C. § 1253(h).

In 1968 the United States became a signatory to the 1967 United Nations Protocol Relating To The Status of Refugees. 19 U.S.T. 6223, T.I.A.S. No. 6577. The Protocol incorporates Article 33 of the 1951 Convention Relating to the Status of Refugees, which *prohibits* the deportation of a refugee "to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." *Id.*

Section 208 of the Immigration and Nationality Act was added by the Refugee Act of 1980, and directs the Attorney General to "establish a procedure for an alien physically present in the United States ... to apply for asylum ..." and gives to the Attorney General the authority to grant asylum to

qualified refugees. 8 U.S.C. § 1158. The regulations establishing the procedure for applying for asylum are codified in the Code of Federal Regulations, at 8 C.F.R. § 208 (1981).

What is obvious to the Court at this point is that the United States has, by treaty, statute, and regulations, manifested its intention of hearing the pleas of aliens who come to this country claiming a fear of being persecuted in their homelands. The intention is not necessarily stated as granting the privilege of asylum to all who come to this country but of hearing those pleas.

■■■ As submitted by plaintiffs, the failure of the Immigration Service to notify detainees of the right to apply for asylum may effectively render the treaties and statutes discussed above, as well as the intentions behind them, virtually non-existent for the majority of persons who might claim their benefits. The defendants' argument that, since no regulation specifically requires the INS to inform detainees of their right to apply, they therefore do not have to, is not persuasive. While the Court acknowledges that traditionally it has a more limited scope of review when it comes to immigration matters, *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977), it is always within the Court's province to act when an agency decision or practice frustrates the congressional policy underlying a statute. *See Labor Board v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965); *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584 (D.C.Cir.1971).

Plaintiffs also submit that the failure of defendants to inform detainees that they have the right to apply for political asylum is violative of the Fifth Amendment's due process guarantee.

■■■ The guarantees of procedural due process apply only to governmental decisions which deprive individuals of "liberty" or "property" interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901,

47 L.Ed.2d 18 (1976). *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1971). Defendants herein do not dispute that aliens within the borders of the United States, whether legally or illegally, are protected by the requirements of due process. *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1977). Defendants argue, however, that the right of aliens to apply for political asylum or withholding of deportation is not an interest protected by constitutional due process guarantees.

A determination of whether due process is required in a given case must be made by first examining the nature of the interest at stake. *See, Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). As stated in regards to the due process required in the processing of an application for asylum:

"In a very graphic sense, the political asylum applicant who fears to return to his homeland because of persecution has raised the specter of truly severe deprivations of life, liberty, and property; in this case, harassment, imprisonment, beatings, torture, and death."

*Haitian Refugee Center v. Civiletti*, 503 F.Supp. 442, 455 (S.D.Fla.1980). The interest of an alien with the same fear is no less simply because, not knowing he has the right, he has not filed an application for asylum. It is not necessary to discuss in depth the conditions existing in El Salvador and Guatemala. The daily news reports from these countries sufficiently detail the foundation for the fears many refugees have. Certainly the interests here are life and liberty.

Although the grant or denial of asylum is within the discretion of the Attorney General, the Refugee Act of 1980 must be held to at least require that a claim for asylum be heard. Furthermore, the withholding of deportation or return to a country where "such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion" is statutorily prohibited. 8 U.S.C.

§ 1253(h)(1). Benefits prescribed by statute often come within the protection of procedural due process. *See e.g., Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969).

Defendants further assert that, assuming the opportunity to apply for asylum is a protectable interest, procedures currently in effect satisfy due process. This claim necessitates a review of those procedures.

Aliens present in the United States illegally may be caused to leave basically in one of two ways—either directly deported, or through what is known as "voluntary departure." Formal deportation proceedings are initiated by an Order to Show Cause, which order informs the alien of the nature of the proceeding, the legal authority for such proceeding, and the time and place for the deportation hearing. 8 U.S.C. § 1252(b); 8 C.F.R. § 242.1. The alien is also told that he has the right to remain silent and the right to be represented by counsel of his choice at no expense to the United States. 8 C.F.R. § 242.1.

The Attorney General is authorized to allow certain classes of deportable aliens to voluntarily depart from the United States. 8 U.S.C. § 1252(b), (g); 8 C.F.R. § 244.1–2. An alien in this instance admits to being in this country illegally, and no hearing is had in his case. He is informed that he has the right to consult a lawyer and the right to ask for a hearing.

The provisions for voluntary departure can be beneficial to both the INS and the alien. The INS benefits because for the great number of aliens voluntarily departing prior to the commencement of deportation proceedings, the Service is spared the time and expense of providing those proceedings. The alien can benefit in two ways; first, voluntarily departing can save him from spending weeks or months in detention pending the outcome of his case. Secondly, the alien will not have a deportation order on his record and thus may be eligible to enter the country legally at a later date.

There are presently two ways that an alien claiming asylum can have that claim reviewed by the INS. The first of these is applicable to cases wherein the alien has not yet been served with an Order to Show Cause—that is, where formal deportation proceedings have not yet been commenced. In this instance an application for asylum is submitted directly to the local INS District Director. 8 CFR § 208.3(a)(2). Rules governing the District Director's decision are set out at 8 C.F.R. § 108.2.

If deportation proceedings have already begun, the application for asylum is filed in quadruplicate with the docket clerk of the immigration court. 8 C.F.R. § 108.3, 208.-3(b). In this instance, the merit of the asylum claim is determined by the Immigration Judge, after a hearing on the matter. Furthermore, the request for asylum is at this point also considered as a request for withholding of deportation under Section 203(e) of the Refugee Act of 1980.

Except in one instance, the present regulations do not require the INS to notify aliens of their right to apply for political asylum or for withholding of deportation. The exception applies to cases wherein deportation proceedings have already commenced.

In this case the alien must be told by the Immigration Judge that if he is finally ordered deported, he may designate the country to which he wishes to be deported. The Immigration Judge then designates one or more alternative countries to which the alien will be deported in the event the country designated by the alien fails to accept him, or if he fails to designate a country of his choice. 8 C.F.R. § 242.17(c). He must then be advised that he may apply for temporary withholding of deportation to the country or countries designated by the Immigration Judge. *Id.* If the alien designates a country and is in fact ordered deported to that country, he is not notified that he may apply for asylum.

Due process is a flexible concept that requires such procedural protections as the particular situation demands. *Greenholz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100,

60 L.Ed.2d 668 (1979); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). The Supreme Court has provided the following framework for determining the "specific dictates of due process" in a particular case.

"[O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Mathews v. Eldridge,* 424 U.S. 319, 334–335, 96 S.Ct. 893, 902–903, 47 L.Ed.2d 18 (1976).

The Plaintiff's interest herein, as stated, is obvious. Deportation or voluntary return to a country where the detainee fears persecution could result in injury or even death. The present procedures do not sufficiently assure that genuine asylum claims will be heard, nor do they assure that an alien subject to persecution will not be returned to the country of his persecutors. It is important to realize the circumstances present. The majority of detainees are completely uneducated as to INS procedures. They do not speak the English language, nor can they read the English language asylum application required for consideration. The detention center is not located in an area where detainees can easily find legal representation, nor are they entitled to appointed counsel under the law.

The Immigration Service argues that the cornerstone of American jurisprudence is the adversary system, and that notifying detainees of their right to apply for asylum goes against the grain of that system. Our system of jurisprudence, however, is designed for determining the truth, with the premise that the truth is best arrived at by full development of all the issues involved. Full development of the claims of asylum of these fleeing people, however, must start with notice of that issue, lest they never have their day.

Notice to persons of their rights or remedies has been required by the Courts in other situations. For example, notice to housing project tenants of their right to receive retroactive housing benefits was required by the court in *Holbrook v. Pitt,* 643 F.2d 1261, 1281 (7th Cir. 1981), and notice to a debtor not only of an attempt to garnish an account, but also notice of the legal exemptions to which she might be entitled, was required in *Finberg v. Sullivan,* 634 F.2d 50, 62 (3rd Cir. 1980).

The burden on the Government as a result of this requirement is not the giving of the notice, but the likelihood of persons without valid claims of asylum applying for that relief, thereby causing the time and expense of needless hearings, and causing those persons to remain in detention much longer than necessary, especially where they might instead be returned voluntarily after only a short period of detention. It is true that giving such notice may result in unworthy claims being filed and in a longer than necessary detention for some aliens. The Court is of the opinion, however, that this possibility does not override the need for those with worthy claims to have them heard.

While plaintiffs claim that this notice must be given before voluntary departure, before a deportation hearing, and during a deportation hearing, the Court finds that the notice will be sufficient if given before the alien is caused to depart, whether voluntarily or by deportation, and if given at such time that allows those aliens wishing to apply for asylum to do so meaningfully.

Besides showing a likelihood of prevailing on the merits, plaintiffs have also met their burden of showing that they may suffer irreparable injury if this injunction does not

issue. Deportation to a country where one's life would be threatened obviously would result in irreparable injury. Furthermore, once deported or returned, an alien loses any chance he may have had to have his deportation reviewed. *See* 8 U.S.C. § 1105a(c).

The Court further finds that the injury threatened to plaintiffs outweighs the possible harm of the injunction to defendants, and that granting this injunctive relief is in the public interest. This Court fully appreciates the burden that may result to defendants due to the requirements of this Order. Providing refuge to those facing persecution in their homeland, however, goes to the very heart of the principles and moral precepts upon which this country and its Constitution were founded. It is unavoidable that some burdens result from the protection of these principles. To let these same principles go unprotected would amount to nothing less than a sacrilege.

For the reasons set forth above, this Court is of the opinion that the temporary injunctive relief prayed for by plaintiffs should be and is hereby GRANTED, and it is hereby;

ORDERED that the Preliminary Injunction issued by this Court on January 5, 1982, remain in force and effect, and further

ORDERED that Defendants are enjoined from failing to give notice to detainees who are citizens and nationals of El Salvador or Guatemala, prior to their deportation or voluntary return, of their right to apply for political asylum in the United States.