**Jose Irene RAMIREZ–OSORIO, Petitioner,**

**v.**

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**Jose Ismael RUBIO, Petitioner,**

**v.**

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**Nos. 83–4545, 83–4546.**

United States Court of Appeals, Fifth Circuit.

Oct. 23, 1984.

Rehearing and Rehearing En Banc Denied Dec. 13, 1984.

the issue of bypass, we are not constrained to consider it here.

Lisa S. Brodyaga, Harlingen, Tex., Michael J. Jacobsen, Houston, Tex., for Ramirez-Osorio.

Proyecto Libertad, Lisa S. Brodyaga, Harlingen, Tex., Michael J. Jacobsen, Houston, Tex., for Rubio.

William French Smith, Atty. Gen., Richard K. Willard, Acting Asst. Atty. Gen., Lawrence Lippe, Chief, Gen. Lit. and Legal Advice Sec., Crim. Div., Charles E. Hamilton, III, Millicent Y. Clarke, James A. Hunolt, Francesco Isgro, Dept. of Justice, Civ. Div., Washington, D.C., Hal Boldin, Dist. Dir., I.N.S., Harlingen, Tex., David H. Lambert, Dist. Dir., I.N.S., New Orleans, La., for I.N.S.

Before GARZA, GARWOOD and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We are asked to hold that the Immigration and Naturalization Service in all deportation proceedings must inform each alien of his "right" to petition for asylum and inform him that filing a petition for asylum automatically stays deportation until the request is answered. We are told that not giving such notice frustrates congressional will as expressed in the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102 (1980), and that, regardless, constitutional due process mandates such notice. Despite this argument's humanitarian tug, we are unable to find the asserted congressional purpose or claimed due process deprivation. We affirm the two orders of deportation before us.

I

Without inspection, Jose Irene Ramirez-Osorio and Jose Ismael Rubio, natives and citizens of El Salvador, entered the United States in the respective areas of Hidalgo and Brownsville, Texas. Both were ordered to appear before immigration judges at the Los Fresnos Service Processing Center and show cause why they should not be deported from the United States for entry without inspection, pursuant to Section 242 of the Immigration and Nationality Act, 8 U.S.C. § 1252. Before immigration judges, each conceded his deportability after substantially similar advice regarding his right to counsel.

Rubio's hearing was with two other aliens. At the hearing the immigration judge informed all three aliens of their right to counsel in these words:

Immigration Judge:

Q. Now, each of you has certain rights in the proceeding. If you wish it, you have the right to be represented. You don't have to be represented, you can waive that and speak for yourself.

Respondents:

A. Without representation.

Ramirez-Osorio's hearing was with eleven other aliens. The immigration judge informed them of their right to counsel in more detail than in Rubio's case, telling them not only of their right to counsel, but also that he would continue the proceedings if they wished counsel, and reminding them they had been provided with a list of legal aid offices that might take their cases. All twelve repeatedly signaled by

raising their hands that they wished to proceed without counsel.

Rubio and Ramirez-Osorio admitted all the allegations against them, and in answer to questioning stated that they wished to be deported to El Salvador. At no point did either Rubio or Ramirez-Osorio express any fear of persecution upon return to El Salvador. Neither of the immigration judges told petitioners that they could apply for asylum and withholding of deportation and they were ordered to be deported to El Salvador. Petitioners' present counsel was retained shortly after the hearing in each case; she immediately appealed the deportation orders to the Board of Immigration Appeals, thereby automatically staying the orders. *See* 8 C.F.R. § 3.6(a).

Petitioners' argument before the BIA was solely procedural. They argued that the immigration judges should have informed them of their right to apply for asylum, and inadequately informed them of the significance of their right to counsel. Besides rejecting both of these arguments on the merits, the BIA supported the dismissal of the appeals on the ground that petitioners had never submitted applications for asylum, despite the retention of counsel and the passage of significant periods of time—over one year since Ramirez-Osorio's deportation hearing, and over nine months in Rubio's case. Following the BIA's dismissal, these petitions for review were filed, again automatically staying the orders of deportation. *See* 8 U.S.C. § 1105a(a)(3). Petitioners have not filed motions to reopen with the BIA since the dismissal of their appeal.

## II

We turn first to the government's argument that petitioners have not ex-hausted administrative remedies. We will not review a deportation order "if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations." 8 U.S.C. § 1105a(c). Of course, exhaustion is not required when administrative remedies are inadequate. *See, e.g., NLRB v. Industrial Union of Marine and Shipbuilding Workers of America,* 391 U.S. 418, 426 n. 8, 88 S.Ct. 1717, 1723 n. 8, 20 L.Ed.2d 706 (1968); *Camenisch v. University of Texas,* 616 F.2d 127, 134 (5th Cir.1980); B. Mezines, J. Stein, & J. Gruff, 5 *Administrative Law* § 49.02[1] (1983). The government argues that petitioners' failure to apply for asylum is fatal to this appeal, stating that the deportation orders might have been lifted if petitioners had proved they would be subject to persecution. Petitioners counter that there was no realistically available administrative channel by which they could have presented their applications for asylum once their deportation hearings were concluded. Because we find that the available administrative remedies would not be sufficiently effective in this case, we decline to require that they be pursued before appeal to this court.

There is a procedure available by which one who fails to present an asylum claim at his deportation hearing can, along with appealing the deportation decision, submit an application for asylum to the BIA either as a "motion to reopen," *see Matter of Escobar,* Interim Decision 2944 (June 28, 1983), or a "motion to remand," *see* 8 C.F.R. § 3.1(d)(2); C. Gordon & H. Rosenfeld, 1A *Immigration Law & Procedure,* § 3.22a (1984); Nat'l Lawyer's Guild, *Immigration Law & Defense* § 9.2 (1983). *See* 8 C.F.R. § 3.2. The regulations in effect make separate provision for a petition for asylum filed after a deportation hearing.[1] Point-

---

**1.** An alien may request that an exclusion or deportation proceeding be reopened pursuant to 8 C.F.R. 103.5 or 8 C.F.R. 242.22 respectively, on the basis of a request for asylum. Such request must reasonably explain the failure to request asylum prior to the completion of the exclusion or deportation proceeding. If the alien fails to do so, the asylum claim shall be considered frivolous, absent any evidence to the contrary. Nothing in this part, however, shall be construed to prevent an alien from requesting relief under section 243(h) during exclusion or deportation proceedings.
8 C.F.R. § 208.11.

8 C.F.R. § 103.5 also applies to motions to reopen exclusion proceedings:

Except as otherwise provided in Part 242 of this chapter, a proceeding authorized under

ing out that a motion to reopen requires new evidence unavailable at the deportation hearing, petitioners conceded they had no new evidence but rather only an explanation that they did not know they could apply for asylum.

■ Moreover, the government's argument would require petitioners to pursue before our review a remedy that would not assure any hearing before deportation. After deportation any asserted right to asylum would not be heard.[2] There is an unqualified "right" to petition for asylum only within the ten-day period for appeal following the decision of the immigration judge. After this ten-day period, a request for asylum is addressed to the discretion of the agency. There is no longer an automatic suspension of deportation pending the ruling upon the motion to reopen. See 8 C.F.R. §§ 3.6, 3.8. A stay can be requested but its denial is not an appealable order. *Bonilla v. INS,* 711 F.2d 43 (5th Cir.1983). We are persuaded that motions to reopen the deportation hearings in order to petition for asylum are not here a sufficiently effective remedy that they must be pursued before an appeal to this court.

There is another dimension to the government's argument. With nothing in the record to show that petitioners can prove a clear probability of persecution, *see INS v. Stevic,* —— U.S. ——, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984), there is no showing that they were harmed by not being told of the right to petition for asylum.

The difficulty with this seemingly plausible argument is that it begs an important

---

this chapter may be reopened or the decision made therein reconsidered for proper cause upon motion made by the party affected and granted by the officer who has jurisdiction over the proceeding or who made the decision.... *A motion to reopen shall state the new facts to be proved at the reopened proceeding* and shall be supported by affidavits or other evidentiary material. A motion to reconsider shall state the reasons for reconsideration and shall be supported by such precedent decisions as are pertinent. Motions to reopen or reconsider shall state whether the validity of the order has been or is the subject of any judicial proceeding and, if so, the nature and date thereof, the court in which such proceeding took place or is pending, and its result or status. Rulings upon motions to reopen or motions to reconsider shall be by written decision. The filing of a motion to reopen or a motion to reconsider or of a subsequent application after notice of denial shall not, unless the Service directs otherwise, serve to stay the execution of any decision made in the case or to extend a previously set departure date.
(Emphasis supplied).
8 C.F.R. § 242.22, applying to motions to reopen deportation proceedings, reads:
Except as otherwise provided in this section, a motion to reopen or reconsider shall be subject to the requirements of § 103.5 of this chapter. The immigration judge may upon his/her own motion, or upon motion of the trial attorney or the respondent, reopen or reconsider any case in which he/she had made a decision, unless jurisdiction in the case is vested in the Board of Immigration Appeals under Part 3 of this chapter. An order by the immigration judge granting a motion to reopen may be made on Form I-328. *A motion to reopen will not be granted unless the immigration judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the hearing;* nor will any motion to reopen for the purpose of providing the respondent with an opportunity to make an application under § 242.17 be granted if respondent's right to make such application was fully explained to him/her by the immigration judge and he/she was afforded an opportunity to do so at the hearing, unless circumstances have arisen thereafter on the basis of which the request is being made. *The filing of an application for adjustment of status under section 245 of the Act may be considered as a motion to reopen when the application shows new material not available or discoverable at the time of the deportation hearing.* The filing of a motion under this section with an immigration judge shall not serve to stay the execution of an outstanding decision; execution shall proceed unless the immigration judge who has jurisdiction over the motion specifically grants a stay of deportation. The immigration judge may stay deportation pending his/her determination of the motion and also pending the taking and disposition of an appeal from such determination.
(Emphasis supplied).

**2.** 8 C.F.R. § 3.2 provides inter alia: "A motion to reopen ... shall not be made ... in behalf of a person who is the subject of deportation proceedings subsequent to his departure from the United States."

part of the question.[3] Taken to its end, the government's argument is that failing to show entitlement to asylum is fatal to petitioners' claim that not being told of the right deprived them of a meaningful opportunity to do so. In this sense, the answer to the exhaustion question answers also the proffered question of prudential standing. If there is a requirement that aliens be told of their right to petition for asylum, the limits placed on its untimely assertion are sufficient to demonstrate the impact of not being told. We turn to that question.

### III

Since 1980, aliens have had two possible paths for seeking asylum within the United States, those seeking to immigrate to this country aside. An alien can apply for asylum with the local District Director of the INS. See 8 C.F.R. § 208.3(a)(2). This petition addresses the discretion of the agency and is not subject to judicial review. 8 C.F.R. § 208.8(c). If deportation proceedings under 8 C.F.R. § 242.1 are commenced, or a reference under 8 C.F.R. § 236.3 is made, exclusive jurisdiction to entertain an asylum petition lies with the immigration judge. See 8 C.F.R. § 208.-3(b). A petition for asylum filed with the immigration judge is simultaneously regarded as a request for the withholding of deportation under Section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h). See 8 C.F.R. § 208.3(b).[4]

Although under normal INS procedures, aliens are not routinely told of their right to petition for asylum, notice is required when the country of deportation is designated by the hearing officer. 8 C.F.R. § 242.17(c).[5] In addition, the Attorney General has had the explicit power since at least 1950 to withhold the deportation of any alien "to any country in which the Attorney General shall find that such alien would be subjected to physical persecution." 64 Stat. 1010; see also Immigration and Nationality Act § 243(h), Pub.L. No. 82–414, 66 Stat. 212 (1952) (current version at 8 U.S.C. § 1253(h)). Under current INS procedures based upon that authority, aliens are also informed of their right to petition for asylum if they give any indication of fear of persecution upon being returned.[6]

3. Part of the asserted deprivation worked by the absence of notice and the limits upon motions to reopen is loss of the unqualified character of the "right" to petition for asylum with its companion automatic suspension of deportation, a right found by several courts to be constitutionally secured. *Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1038–39 (5th Cir.1982); *Jean v. Nelson,* 711 F.2d 1455, 1507 (11th Cir.1983), *rev'd on other grounds,* 727 F.2d 957 (11th Cir. 1984) (en banc); *Nunez v. Boldin,* 537 F.Supp. 578, 584 (S.D.Tex.), *appeal dism'd without op.,* 692 F.2d 755 (5th Cir.1982). We need not explore the nature of the asserted right to petition for asylum in order to answer the question of whether petitioners have made a sufficient showing of harm as to be able to question the absence of notice of that right.

4. This is so because the Act specifically amended the withholding of deportation provisions to prohibit the deportation of any alien if the Attorney General determines that such alien's life or freedom would be threatened. 8 U.S.C. § 1253(h).

5. Section 242.17(c) provides:
   *Temporary withholding of deportation.* The special inquiry officer shall notify the respondent that if he is finally ordered deported his deportation will in the first instance be directed pursuant to section 243(a) of the Act to the country designated by him and shall afford the respondent an opportunity then and there to make such designation. The special inquiry officer shall then specify and state for the record the country, or countries in the alternate, to which respondent's deportation will be directed pursuant to section 243(a) of the Act if the country of his designation will not accept him into its territory, or fails to furnish timely notice of acceptance, or the respondent declines to designate a country. *The respondent shall be advised that pursuant to section 243(h) of the Act he may apply for temporary withholding of deporation [sic] to the country or countries specified by the special inquiry officer* and may be granted not more than ten days in which to submit his application.
   (Emphasis supplied).

6. In June 1980, David Crosland, Acting Commissioner for the INS, testified in Congressional hearings that aliens "are interviewed as to why they came here. If they have questions that would flag asylum claims such as fear of persecution upon being returned, they are identified. *Those persons* are told what their rights are...." [*Caribbean Migration: Oversight Hearing Before*

This procedural complex plays only one role in the larger overall story of asylum petitions in the U.S. immigration scheme. Under the Refugee Act the numbers of immigrants to be admitted as "refugees" are limited by quotas and allocations set by the executive branch and, to some extent, the Congress,[7] calibrations often made by the government's foreign policy hand. Yet, there are no such explicit limits on the numbers admitted under the asylum provisions of the Act. Under Section 243(h) of the Immigration and Nationality Act, if the Attorney General determines that an alien has established a well-founded fear of persecution, he cannot be returned to his home country. 8 U.S.C. § 1253(h). Thus, as has been observed, "[a]sylum constitutes a wild card in the immigration deck, ... and there are strong incentives to administer ... [asylum] standard[s] with scrupulous care ...."[8]

## IV

While largely ignoring the distinction between a refugee's petition for asylum and an alien's request for withholding deportation, at least three courts have found an obligation to give notice of the right to petition for asylum. *See Duran v. INS,* No. 82–7193 (9th Cir. May 14, 1984) (petition for reh'g pending); *Orantes-Hernandez v. Smith,* 541 F.Supp. 351, 376 (C.D.Cal.1982); *Nunez v. Boldin,* 537 F.Supp. 578, 587 (S.D.Tex.), *appeal dism'd without op.,* 692 F.2d 755 (5th Cir.1982). At least one has rejected the argument in the case of excludable aliens. *Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984) (en banc).

*Duran* and *Orantes-Hernandez* did not reach the constitutional argument, but the *Nunez* court found that the disputed notice is required as a matter of due process. These courts have been persuaded that "the statutory language, purpose, and legislative history of the Refugee Act of 1980 demonstrate clear Congressional intent to confer a right to apply for asylum and a right to receive asylum if the alien can present sufficient evidence of likelihood of persecution. Both the right to apply for and the right to obtain asylum would be meaningless, however, if immigration authorities were not required to notify aliens of those rights." *Duran v. INS,* slip op. at at 7. These courts suggest that, because regulations implementing the Immigration and Nationality Act require that aliens be given other notices such as the right to apply for suspension of deportation under § 244(a), it would be "anomalous" not to give notice of the right to petition for asylum. *Id.*

The Eleventh Circuit has concluded that neither the Refugee Act nor the Constitution obligates the government to notify aliens facing deportation of their right to apply for asylum. *Jean v. Nelson,* 727 F.2d 957, 981–83 (11th Cir.1984) (en banc). Although its language seems to encompass aliens subject to a show cause order, *Jean* dealt only with the rights of excludable aliens. Such refugee petitions are addressed to the discretion of the INS, and the court found no basis for inferring a congressional purpose of requiring such advice for all excludable aliens. The *Jean* court also rejected the aliens' constitutional

the Subcomm. on Immigration, Refugees and International Law of the House Comm. on the Judiciary, 96th Cong. 2d Sess. 225 (1980) (emphasis supplied).] Such history as there is has been gathered in an informative note, *Protecting Aliens From Prosecution Without Overloading The INS: Should Illegal Aliens Receive Notice Of The Right To Apply For Asylum,* 69 U.Va.L.Rev. 875, 907 (1983). We draw upon that thoughtful work. The dissent suggests that INS did not interview petitioners as to why they came here. The record does not show whether this occurred. Only the actual advice at the show cause hearing was transcribed and is before us. Regardless, the current practice that persons

who express a fear of returning to their home state are informed of their right to petition for asylum is significant.

7. For a detailed description of the workings of the "refugee" provisions of the Act and the allocation of responsibilities between the executive branch and the Congress, see Martin, *The Refugee Act of 1980: Its Past and Future,* in Transnational Legal Problems of Refugees 96–109 (1982).

8. *Id.* at 112–13.

claim, reasoning that because asylum was a statutory benefit dispensed at the discretion of an agency, there was no substantive interest protected by the Constitution. *Id.* at 981–82. We are persuaded that in deportation proceedings as well, notice of the right to file for political asylum is neither required to avoid frustrating congressional purpose nor guaranteed as a constitutional right.

–1–

■ We begin by noting that nothing in the language or legislative history of the Refugee Act of 1980 makes explicit mention of notice. Although the language of § 243(h) that the Attorney General was "authorized to withhold" deportation of qualified aliens to countries where they are subject to persecution where he has determined that the alien has made the required proof was amended to provide that he "shall" not deport such aliens to those countries, the legislative history makes clear that the amendment was essentially a conforming amendment[9] to clarify established practice, rather than to require notice. The amendment neither changed the measure of entitlement to asylum nor the placement of the responsibility for making that decision. The entitlement decisions in

deportation proceedings continue to be made by administrative arms of the Attorney General.

Nor is a requirement that every alien be given notice of the right to petition for asylum necessary to make the rights to petition for and obtain asylum meaningful ones. While we recognize that among the purposes behind the Refugee Act was to give "statutory meaning to our national commitment to human rights and humanitarian concerns," S.Rep. No. 256, 96th Cong., 2d Sess. 1, *reprinted in* 1980 U.S. Code Cong. & Ad.News 141, and to continue the "historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," Refugee Act of 1980 § 101, 8 U.S.C. § 1521 (note), blanket notice to aliens that they are entitled to petition for asylum may not necessarily be the means best suited to those ends.

As discussed above, under current INS procedures an alien is notified of his right to petition for asylum if he is to be deported to a country other than the one he designates or if it appears that he may be persecuted on his return. The government defends this practice as being a reasonable

---

**9.** Early drafts of the proposed amendment to § 243(h) had kept the "authorized" language. By the time of the House Report, "shall" had replaced "authorized." The House Report noted:

> (2) *Withholding of Deportation.*—Related to Article 33 is the implementation of section 243(h) of the Immigration and Nationality Act. That section currently *authorizes* the Attorney General to withhold the deportation of any alien in the United States to any country where, in his opinion, the alien would be subject to persecution on account of race, religion, or political opinion.
>
> *Although this section has been held by court and administrative decisions to accord to aliens the protection required under Article 33, the Committee feels it is desirable, for the sake of clarity, to conform the language of that section to the Convention.* This legislation does so *by prohibiting,* with certain exceptions, the deportation of an alien to any country if the Attorney General determines that the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion.

H.R.Rep. No. 608, 96th Cong., 1st Session, 18 (1979). Article 33 of the Convention and Protocol Relating to the Status of Refugees, like the amended section 1253(h), provides that no such person "shall" be sent to the persecuting country. *See also INS v. Stevic,* 104 S.Ct. at 2493 n. 5.

*Stevic* pointed out the difference between an alien at the border seeking refuge and an alien seeking to avoid deportation, and noted that accession by the United States to the United Nations Protocol Relating to the Status of Refugees, June 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, "bound parties to comply with the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees ... with respect to 'refugees' as defined in Article 1.2 of the Protocol." *Id.* at 2494. Ultimately, the *Stevic* court rejected the argument that Section 203(e) of the Refugee Act of 1980, in its changes to 243(h), altered the measure for an alien's establishing the certainty of his persecution. In doing so, the *Stevic* court described the changes to 243(h), the deportation provision, made by the Refugee Act of 1980 as "a mere conforming amendment, added 'for the sake of clarity.'" *Id.* at 2500.

administrative response to the competing concerns inherent in any prescription for the time and manner of notice. It argues, and we agree, that it is not unreasonable to assume that persons who fear return to their country will say so.

In sum, the practice of the INS has been to avoid giving blanket notice of the right to petition for asylum, but not to decline to give any notice at all. Absent evidence of contrary Congressional intent, we will not construe the Refugee Act of 1980 to require the INS to do more.

–2–

■ The constitutional claim is rooted in the Fifth Amendment's guarantee of due process and not in the Sixth Amendment's right to counsel. A deportation proceeding is a civil, not a criminal, action. *INS v. Lopez-Mendoza*, —— U.S. ——, 104 S.Ct. 3479, 3484, 82 L.Ed.2d 778 (1984). As we have explained, "our role in this type of proceeding is not to consider the fundamental fairness of the result, but only to consider the underlying fairness of the hearing in terms of the statutory scheme and the constitution," *Aalund v. Marshall*, 461 F.2d 710, 714 (5th Cir.1972), keeping in mind that the near-plenary power of Congress in matters of immigration remains subject to the constitutional limits of due process. We first ask whether there is a constitutionally protected interest and then ask how any formal right is to be vindicated.

■ Petitioners' constitutional argument draws from the reasoning of *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). While *Greenholtz* concluded that the Nebraska Parole Relief Statute in holding out the possibility of parole did not create a constitutionally protected interest, it found a protected liberty interest in the statute's mandatory parole release language. Petitioners urge that because § 243(h) as amended in 1980 mandates the withholding of deportation when an alien meets the proof requirements, *Greenholtz* requires the finding of a liberty interest. Relatedly, the argument continues, the 1968 accession to the United Nations protocol, at least when implemented by the Refugee Act of 1980, created a justified expectation in aliens of a right of nonrefoulement to countries where they would be persecuted. That expectation is supported by *Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1039 (5th Cir. Unit B 1982), which found a protectible liberty interest in nonrefoulement, concluding that there was a right to "submit and substantiate" asylum claims.

Assuming without deciding that there is a sufficiently secured right of nonrefoulement as to give rise to a protectible liberty interest, the more sharply drawn question is whether the resulting due process requirements include a right of notice. The argument for a required notice of rights draws upon principles of waiver as well as *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), and their progeny.

Petitioners, relying on *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), analogize their situation to criminal defendants by arguing that the right to petition must be affirmatively waived. We are not persuaded. "Consistent with the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing." *INS v. Lopez-Mendoza*, 104 S.Ct. at 3484. *Lopez-Mendoza*, in declining to apply the exclusionary rule to deportation proceedings, cited approvingly cases finding that the absence of *Miranda* warnings did not render otherwise voluntary statements inadmissible in deportation proceedings. *Id.*, citing *Navia-Duran v. INS*, 568 F.2d 803, 808 (1st Cir.1977); *Avila-Gallegos v. INS*, 525 F.2d 666, 667 (2d Cir.1975); *Chavez-Raya v. INS*, 519 F.2d 397, 399–401 (7th Cir.1975). Moreover, even certain involuntary confessions are admissible at deportation hearings. *See United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 157, 44 S.Ct. 54, 57, 68 L.Ed. 221 (1923).

The court in *Orantes-Hernandez* required notice of the right to petition for asylum in part on the grounds that "a waiver of rights must be knowingly and intelligently made ...." *Orantes-Hernandez*, 541 F.Supp. at 376–77, citing *Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). We decline, however, to apply that waiver standard in deportation proceedings such as the one before us. In deportation proceedings, the alien's right to petition for asylum is in the nature of a defense assertable by an alien. Its stay arises only at the behest of the petitioning alien. As such, it is controlled by the Court's analysis in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Simply put, we have not required a "knowing and intelligent waiver in every situation where a person has failed to invoke a constitutional protection ... but, almost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial." *Id.* at 235, 237, 93 S.Ct. at 2051, 2053.[10] In our view the right to petition for asylum does not readily fall among those rights for which a knowing and intelligent waiver is essential, and we decline to require such notice in deportation proceedings on that basis. Whatever notice is required, therefore, must be found elsewhere.

Petitioners also urge that under *Mullane v. Central Hanover Bank & Trust Co.* and *Memphis Light, Gas & Water Division v. Craft*, the INS cannot "terminate" petitioners' right to petition for asylum without notice of that right. *Mullane* establishes that due process requires notice to interested parties whose rights might be affected by a pending proceeding that is to be accorded finality. *Mullane*, 339 U.S. at 314, 70 S.Ct. at 657. The *Memphis Light* Court, relying on *Mullane* and the framework for due process decisions provided by *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), affirmed an order requiring a utility to notify customers of impending termination for nonpayment and of a procedure for disputing bills. The Court noted that the utility customers lacked the "education, experience and resources" necessary for an awareness of an essential dispute procedure. *Memphis Light*, 436 U.S. at 15 n. 15, 98 S.Ct. at 1563 n. 15. The court in *Nunez v. Boldin*, 537 F.Supp. 578 (S.D.Tex.1982), relied on the application of *Memphis Light* by the Seventh Circuit in *Holbrook v. Pitt*, 643 F.2d 1261 (7th Cir. 1981), and the Third Circuit in *Finberg v. Sullivan*, 634 F.2d 50 (3d Cir.1980) (en banc),[11] and ruled that the INS was obligated to notify the Guatemalans and Salvadorans detained at the Los Fresnos facility of the right to seek asylum. While declining to state a specific point at which such notice was required, the court in its grant of a preliminary injunction made plain that blanket notice would be required. *Id.* at 586.

We are not prepared to read *Memphis Light, Holbrook*, and *Finberg* so broadly. In all of these cases, the framework for analysis is provided by *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). That decision teaches that the dictates of due process require consideration of three distinct factors: the individual interest at stake, the risk of mistake inherent in the procedure, and the potential for correction by changed proce-

---

**10.** Specifically, the *Schneckloth* Court held that due process does not require that one who can block a search by refusing to consent be informed of that right before the search is conducted. *Id.* at 248, 93 S.Ct. at 2058. Petitioners suggest that their waiver of the right to counsel was not knowingly made because they were not told of their right to petition for asylum and a lawyer would doubtlessly have told them of the right. No argument is made that this case presented uniquely complex facts as in *Partible v. INS*, 600 F.2d 1094 (5th Cir.1979). The argument is thus only an obliquely restated claim of right to notice.

**11.** In *Holbrook*, the Seventh Circuit ruled that a tenant plaintiff class was entitled to notice of retroactive housing assistance, 643 F.2d at 1280–81. In *Finberg*, the Third Circuit required that garnishees be given notice of legal exemptions from garnishment for social security benefits. 634 F.2d at 62.

dures balanced against the additional burden they would present. Conspicuously absent from the *Memphis Light, Holbrook* and *Finberg* facts is a strong counterbalance of administrative necessity. In *Memphis Light* the Court pointed out that the notice and procedures necessary to satisfy due process were compatible with the utility's interests.[12] Similarly, in both *Holbrook* and *Finberg* the costs associated with providing notice were minimal. In *Holbrook* the notice was to a precisely identified class of housing assistance recipients, and in *Finberg* the required notice to garnishees was directed to those receiving Social Security. The *Nunez* court, however, in requiring blanket notice of the right to petition for asylum, gave little weight to the possible increase in meritless asylum claims, pointing out that such notice would foster "full development of the claims of asylum." *Nunez*, 537 F.Supp. at 586.

While we recognize that many aliens may be unaware of the right to petition for asylum, in light of the additional administrative burdens that might result and the procedures used to identify aliens with meritorious claims, we are not convinced that due process requires such blanket notice.[13] Although blanket notice would be calculated to avoid any loss of asylum rights, we have no basis for discounting the INS judgment that it would generate

such large numbers of frivolous claims as to imperil its purpose. We note that "[i]mmigration officers apprehend over one million deportable aliens in this country every year." *INS v. Lopez-Mendoza*, 104 S.Ct. at 3490. Asylum petitions are being filed in ever-increasing numbers.[14] Once an alien is given notice of the right to petition for asylum there is considerable incentive for him to do so, no matter how slim the chances of success, since an application may well extend deportation proceedings for years.[15] Such frivolous claims not only add administrative burdens but also imperil the identification of non-frivolous claims. That is, refusal to give blanket notice is in this sense calculated to protect those aliens with meritorious claims.

We iterate that, under the current system, all aliens are told of their right to a lawyer. If it appears that an alien may be persecuted on return or if he expresses fear or if he is to be deported to a country other than the one he designates, INS tells him that he can petition for asylum. 8 C.F.R. § 242.17(c).[16] In short, where there is reason to believe an alien may be persecuted, he is told of his right to petition for asylum including the resulting automatic stay of deportation until a section 1253(h) determination is made. The administrative justification for giving notice of the right to petition for asylum only to this higher

---

**12.** The Court stated: "[A] utility—in its own business interests—may be expected to make all reasonable efforts to minimize billing errors and the resulting customer dissatisfaction and possible injury.... Nor should 'some kind of hearing' prove burdensome." *Memphis Light*, 436 U.S. at 18, 98 S.Ct. at 1565.

**13.** Substantive rights are often lost without requiring notice. Before accepting a guilty plea, for instance, a defendant is informed that he is giving up certain rights but need not be informed of the loss of other rights, such as the right to vote. *United States v. Dayton*, 604 F.2d 931, 937 (5th Cir.1979) (en banc).

**14.** From 1978 to 1981, for example, the number of asylum petitions increased from 3,700 per year to 50,000 per year. *Immigration Reform: Hearings Before the Subcomm. on Immigration, Refugees and International Law of the House*

*Comm. on the Judiciary*, 97th Cong., 1st Sess. 648 (1981) (statement of Alan Nelson, Deputy Commissioner, INS).

**15.** As explained earlier, an asylum petition filed in a deportation proceeding automatically stays deportation. Final decisions on asylum claims can take years given the multiple levels of appeals available. These include appeal from the INS District Director's decision to an immigration judge, the BIA, and ultimately a habeas corpus petition appealable through all levels of the federal courts. *See* Note, *supra* note 6, at 904 n. 22.

**16.** *Caribbean Migration: Oversight Hearing Before the Subcomm. on Immigration, Refugees and International Law of the House Comm. on the Judiciary*, 96th Cong. 2d Sess. 225 (1980). *See also supra* n. 6, testimony of David Crosland, Acting Commissioner for the INS.

risk population is the avoiding of abuse by aliens who have little to lose by invoking such a procedure in order to delay their deportation. The current system is calculated to give individualized review to petitions for asylum by avoiding open-ended invitations for meritless claims. In light of the procedures now in place and the reasonably predictable administrative burdens of a blanket notice requirement, with its risks for those aliens with meritorious claims, we do not believe that the *Mathews v. Eldridge* due process standard requires modification of current INS procedures.[17] Finally, lest it go without answer, we hear the apologia that it is a "living" constitution which we expound but it adds no light to our present task. We pause at its refrain only to remind that due process is no cape for legislating judicial perceptions of the public good concerning subjects, as here, peculiarly within the domain of Congress, lying near, and sometimes touching, the executive role in matters of foreign policy. Viewed alone, the giving of blanket notice may seem to be a small matter, little to ask. But one quickly sees that it is actually only a tile of a mosaic with a complexity of balance which counsels against tinkering, either with the heavy concretizing hand of constitutional right or through supposed findings of congressional purpose.

We find that the INS violated neither the command of the Congress nor the Constitution in not telling petitioners that they could petition for asylum. There being no other challenge, the orders of deportation are affirmed.

AFFIRMED.

GARZA, Circuit Judge, dissenting:

I respectfully dissent. I congratulate the majority for the scholarly exposition of the problems of refugees and those that seek political asylum.

I must dissent, however, because the majority focuses on aliens in general, who are apprehended in this country after an illegal entry. They fail to focus on the aliens from El Salvador like the ones who are before us. They ignore the two preliminary injunctions that the Immigration & Naturalization Service was under at the time of the hearings of the two Salvadorian aliens who we have before us.

One of those injunctions came from Judge Vela of the Southern District of Texas in *Nunez v. Boldin*, 537 F.Supp. 578. In that case, Judge Vela ordered the Immigration & Naturalization Service to notify aliens from El Salvador and Guatemala of their right to apply for political asylum. While Judge Vela did not specify at what point the INS should notify these aliens of such right, it is clear that no such notifica-

---

17. Our decision also finds support in *Haitian Refugee Center v. Smith,* 676 F.2d 1023 (5th Cir.1982), where the court held that the right to petition for asylum was an interest protected by due process. In discussing the contours of the right there recognized the court stated:

[W]e [are not] subscribing to the views advanced by Professors Van Alstyne and Tribe ... that 'liberty' as used in the due process clause encompasses a personal freedom from governmental procedural arbitrariness.... While they argue that the Constitution itself should be interpreted as creating this freedom, we have identified only an entitlement created by the federal government.... We deem it premature at this point to dictate the precise content of the procedures which would be constitutionally required.

*Id.* at 1039, nn. 39, 41. All we decide today is that, assuming aliens have a constitutionally protected right to petition for asylum, the notice and hearing procedures used by the INS provide

sufficient due process protections for the exercise of that right. Judge Garza would remand this case, in part, because he is persuaded that the INS violated the terms of the preliminary injunction issued in *Orantes-Hernandez v. Smith, supra,* and *Nunez v. Baldwin, supra.* Not only has no such contention been made below or here, petitioners ask us to modify the *Nunez* injunction, not enforce it. In *Nunez,* as earlier noted Judge Vela's preliminary injunction ordered only that notice be given before deportation. Petitioners are yet to be deported and his order was indisputably not violated. How Judge Kenyon's sweeping order in *Orantes-Smith* ought to fit with Judge Vela's order, issued virtually at the Los Fresnos facility near Brownsville, Texas, is problematic. In short, the INS has not violated the *Nunez* injunction and no contention has been made that the INS nonetheless violated the injunction of the California district court.

tion was ever given to the petitioners before us. The Immigration & Naturalization Service filed a Motion for Emergency Stay Pending Appeal and Request for Hearing. That matter came before a panel of this court consisting of Judges Gee, Tate and myself. We entered an order in that case which stated as follows:

> Construing the injunctive orders on appeal as applying only to the certified class of citizens and nationals of El Salvador and Guatemala who have been, are, or will in the future be detained at the INS detention center at Los Fresnos, Texas, IT IS ORDERED that the motion of appellant(s) for stay pending appeal is DENIED.

692 F.2d 755. That means that our court left that order still in effect and is still in effect to this day.

This case of *Nunez v. Boldin,* is still pending in the District Court of the Southern District of Texas and it is my understanding that the case was transferred to another judge of the Southern District of Texas and that a hearing on whether the preliminary injunction issued by Judge Vela should be made permanent or set aside has not yet been decided. The Immigration & Naturalization Service tells us that this injunction was not binding in the case of the two Salvadorians before us because they were not being detained at the INS detention center at Los Fresnos. All that the record shows in this regard is that the deportation hearings before the Administrative Law Judges were held at the INS detention center at Los Fresnos.

The second temporary injunction involved in this type of case was issued by Judge Kenyon of the Central District of California in *Orantes-Hernandez v. Smith,* 541 F.Supp. 351 (C.D.Cal.1982). In that case, Judge Kenyon was dealing with aliens from El Salvador and certified a class of people from El Salvador in a very fine and exhaustive opinion. Judge Kenyon ordered the Immigration and Naturalization Service nationwide not to voluntarily, or after deportation hearing, deport any aliens from El Salvador until they were first noti-

fied of their right to apply for political asylum. He explicitly, by exhibits attached to his opinion, ordered the INS to furnish each alien from El Salvador a notice as to his options both in English and in Spanish, which included the right to seek political asylum. This temporary injunction was issued on June 2, 1982, and was really an extension of a similar injunction which had been issued on April 30, 1982. A check of Insta-Cite by our Clerk's office revealed that no further action had been taken in this case. A check by me with the District Court of the Central District of California revealed that no appeal has ever been taken from that case and that the hearing on whether to make the temporary injunction permanent or not is still pending. In the case of petitioner Rubio, the temporary injunction of Judge Kenyon was already in effect when the deportation hearing was held in his case on October 28, 1982. In the case of petitioner Ramirez-Osorio, his hearing was held on March 17, 1982, before the injunction of Judge Kenyon was issued, but it was in effect by the time his order of deportation was made effective by the BIA. The BIA should have seen that the record in his case was devoid of any notification ordered by Judge Kenyon.

The fate of these two preliminary injunctions issued by Judges Vela and Kenyon is still in doubt. We do not know whether these injunctions will be dissolved or made permanent, or what fate awaits them on appeal to the Courts of Appeal of the Fifth and Ninth Circuits. But, the fact remains that they are and were in place at the time that the petitioners before us were ordered deported.

The propriety of the issuance of the temporary injunctions issued by Judges Vela and Kenyon is not before us. Even if the majority feels that they are and we hold them wrongfully issued, they still had to be obeyed until such finding of wrongfulness had been issued. Recently we stated in *Nat. Maritime Union v. Aquaslide 'N' Dive Corp.,* 737 F.2d 1395 (5th Cir.1984), "The simple rule is that a putatively lawful order enjoining specified conduct may be

challenged but may not be disobeyed except at the risk of contempt sanctions." The proceedings before us are not contempt actions against the INS. I ask the majority, is the INS above the law so that they do not have to obey temporary injunctions issued by federal judges dealing with aliens from El Salvador? It is no wonder that the INS has been in no hurry to have these injunctions set aside. After all, they have not been obeying them.

A reading of the International Security and Development Cooperation Act of 1981, Pub.L. No. 97–113 § 731, 1981 U.S.Code Cong. & Ad.News (95 Stat.) 1557, shows that Congress, while wrestling with the question of El Salvador and El Salvadorian refugees, saw fit to state the following in § 731:

> It is the sense of the Congress that the administration should continue to review, on a case-by-case basis, petitions for extended voluntary departure made by citizens of El Salvador who claim that they are subject to persecution in their homeland, and should take full account of the civil strife in El Salvador in making decisions on such petitions.

In expressing the sense of Congress, whom I consider to be the conscience of America, the INS should have been aware of the possibility that aliens from El Salvador presented a special problem. No one who keeps up with the news can be blind to the fact that the civil strife in El Salvador continues with killing by both sides.

Of prime importance to me is the testimony in June of 1980 of David Crosland, Acting Commissioner for the INS, who testified in Congressional hearings that aliens "are interviewed as to why they came here. If they have questions that would flag asylum claims such as a fear of persecution upon being returned, they are identified. Those persons are told what their rights are...." See Footnote 6 in the majority opinion.

A reading of the record before us made before the Administrative Law Judges that held the deportation hearings of Ramirez-Osorio and Rubio, shows that the deportation hearing on Rubio was held on October 28, 1982, and that of petitioner Ramirez-Osorio was held on March 17, 1982, long after the testimony of Acting Commissioner Crosland in June of 1980. Apparently the ALJ's that held the deportation hearings of these two aliens before us did not do what Acting Commissioner Crosland had told Congress was their practice, since the record of those hearings before us is devoid of any question to the petitioners as to why they had come to the United States.

The INS tells us that we should not entertain the appeal of these two aliens because to this day they have not applied administratively for political asylum. As the appellants state, and as the majority acknowledges, it would be useless at this time for such a request to be made. The appellants ask us to set aside the order of deportation, remand this case so it can start anew, and now that Rubio and Ramirez-Osorio have counsel, they can present a meaningful petition for political asylum.

It is undisputed that the right of applying for political asylum is a right subject to the protection of due process. *Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1028–39 (5th Cir.1982). The case of *Duran v. INS*, No. 82–7193 (9th Cir. May 14, 1984) dealt with aliens from the Phillipines. The reasons given in that opinion finding an obligation on the INS to give notice of the right to petition for political asylum, I would hold, are binding when it comes to aliens from El Salvador, even more so than aliens from the Phillipines because of § 731 of the International Security Act of 1981 as quoted above.

I acknowledge just as the majority does that the filing of meritless petitions for political asylum will increase the workload of the Immigration & Naturalization Service, which is one of the reasons advanced by the INS against informing aliens of their right to political asylum. However, heavy as the workload on the administrator of our laws is, it should never interfere with the application of due process.

While the burden of Rubio and Ramirez-Osorio if they are given an opportunity to file a petition for political asylum is great and they might not succeed (*See Immigration & Naturalization Service v. Stevic*, —— U.S. ——, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984); *Lemus de Avelar, et al. v. INS*, 741 F.2d 765 (5th Cir., 1984)), they should have the opportunity to file such application for political asylum as they request.

In summary, I would GRANT the petition for review and REMAND for the following reasons:

(1). The INS ignored and did not follow the temporary injunctions that they were under in *Nunez v. Boldin*, and *Orantes-Hernandez v. Smith, supra.*

(2). The Immigration Service and two administrative law judges in these cases did not follow the procedure which Congress was told was being followed by Acting Commissioner Crosland in determining why Rubio and Ramirez-Osorio had left El Salvador and sought refuge in the United States. If they had been asked why they came to this country, they might have said that they came to this country, not because of their fear of persecution, but to seek work, and we might not have these cases before us. The simple truth, however, is that they were not asked, as Acting Commissioner Crosland told Congress they would be.

(3). I agree with the court in *Duran v. INS, supra,* that without being told of their right to political asylum, this, under the proper circumstances, was a violation of due process and made meaningless the right of aliens from El Salvador to seek political asylum under appropriate circumstances.