In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-1917

JOSE ALFREDO JIMENEZ-AGUILAR,

*Petitioner*,

*v.*

WILLIAM P. BARR, Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A206-156-831

ARGUED JULY 31, 2020 — DECIDED OCTOBER 6, 2020

Before EASTERBROOK and ROVNER, *Circuit Judges*.*

PER CURIAM. Jose Alfredo Jimenez-Aguilar is a citizen of Honduras. In 2003, when he was 14 years old, he entered the United States by stealth ("without inspection") and has remained. Today he is married and has two children. But he

---

* Circuit Judge Barrett, a member of the panel that heard oral argument, did not participate in the decision. The case is being decided by a quorum. See 28 U.S.C. §46(d).

has never received permission to be in this country, and he came to the attention of immigration officials in 2014 after he was arrested for domestic assault.

Placed in removal proceedings, Jimenez-Aguilar sought cancellation of removal on the ground that his return to Honduras would cause "exceptional and extremely unusual hardship" to his spouse and children, all of whom are citizens of the United States. See 8 U.S.C. §1229b(b)(1)(D). Several years passed while he sought modification of two criminal convictions that made such relief unavailable. After one conviction was vacated and the other reduced in grade, and he was found eligible, an immigration judge denied his request on the merits. The IJ found that Jimenez-Aguilar had not shown a potential for "exceptional and extremely unusual hardship." That decision is not subject to judicial review, see 8 U.S.C. §1252(a)(2)(B)(i); *Mireles v. Gonzales*, 433 F.3d 965, 968 (7th Cir. 2006), and we do not discuss it further.

On administrative appeal, the Board of Immigration Appeals rejected Jimenez-Aguilar's contention that his counsel rendered ineffective assistance by discouraging him from making a claim for asylum. The Board also rejected his argument that the IJ should have notified him that asylum or withholding were potential benefits. A regulation requires an IJ to provide such notice when "an alien expresses fear of persecution *or harm* upon return" to his native land. 8 C.F.R. §1240.11(c)(1) (emphasis added). Jimenez-Aguilar alerted the IJ to a potential for "harm" as that word is used colloquially: he testified that he fears vicious criminal gangs and described how two of his cousins and an uncle had been killed by gang members. He also told the IJ that his mother had applied for asylum because of gang violence in Honduras—

and she has recently received it. The Board held, however, that the regulation was irrelevant because Jimenez-Aguilar "had a reasonable opportunity to apply for asylum" without the need for a warning.

That is not, however, what the regulation says. It does not ask whether an alien had a "reasonable opportunity" to seek asylum in the absence of advice from the IJ. It requires the IJ to give specified advice in defined circumstances—and advice from the IJ might have alerted Jimenez-Aguilar that he was entitled to seek more than one kind of relief.

But that conclusion is not enough to entitle Jimenez-Aguilar to a new hearing. The question remains whether a potential for gang violence is "harm" as the regulation uses that word. Colloquial usage cannot be enough. If it were, an IJ would need to alert an alien to the possibility of asylum if the alien feared falling off a bike or being in a hurricane's path. The regulation speaks of "persecution *or* harm" (emphasis added), which implies that the harm need not itself qualify the alien for asylum. But for the requirement to make sense in a removal proceeding, the feared harm must relate to the statutes and rules that deal with permission to remain in the United States.

What sort of relation suffices? The parties' briefs did not address that question. This led us to call for a new round of briefs to discuss the meaning of "harm." We anticipated that the Board's brief would tell us how that word had been interpreted in administrative decisions and request deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). That did not happen. Instead the Board's brief catalogs how the courts of appeals have understood the regulation. As far as the Board's brief shows, the

Board has never considered the meaning of the word "harm." At oral argument, the agency's lawyer confirmed that he had not been able to find a single decision expressing the Board's understanding of that word. Our own search was equally fruitless.

This regulation comes up often in removal proceedings. Its meaning has been litigated in many courts of appeals. Yet the Board has remained silent. That is hardly satisfactory. The Board must have a view about what this regulation means; how else can it and the cadre of immigration judges responsibly handle the thousands of proceedings in which aliens may be eligible for asylum or withholding of removal? Still, given the Board's silence, we must interpret the regulation's language as best we can.

The problem in this regulation is the contrast between the undefined term "harm" and the word "persecution," which has been extensively discussed by Board and courts alike. Persecution means a risk greater than "mere harassment," including "'the use of *significant* physical force against a person's body,' 'the infliction of comparable physical harm without direct application of force,' [or] 'nonphysical harm of equal gravity.'" *N.Y.C.C. v. Barr*, 930 F.3d 884, 888 (7th Cir. 2019) (emphasis in original; citations omitted). To show persecution the alien must demonstrate that the injury would occur "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §1101(a)(42); 8 C.F.R. §1208.13(b)(1). In other words, "[g]eneral conditions of hardship that affect entire populations … are not persecution." *Ahmed v. Gonzales*, 467 F.3d 669, 673 (7th Cir. 2006). And the risk must be created, abetted, or tolerated by the government; private violence

differs from persecution. See 8 U.S.C. §1101(a)(42)(A); *Hor v. Gonzales*, 400 F.3d 482, 485–86 (7th Cir. 2005); *Balogun v. Ashcroft*, 374 F.3d 492, 499 n.8 (7th Cir. 2004).

Jimenez-Aguilar insists that "harm" means any "physical or mental damage." Yet, as we have already mentioned, that understanding would include injuries from volcanoes, playing soccer, reckless driving, and many other things unrelated to immigration law. "The definition of words in isolation … is not necessarily controlling in statutory construction"; instead, "[a] word is known by the company it keeps." *Dolan v. Postal Service*, 546 U.S. 481, 486 (2006) (citation omitted). "Harm" for the purposes of the regulation must mean the sort of physical or mental distress that (with additional details prompted by the IJ's warning) could render one eligible for asylum or withholding of removal.

The context of the regulation shows that it refers to "harm" as it bears on these forms of relief. After all, the regulation's operative language—"[a]dvise … that he or she may apply for asylum … or withholding of removal", 8 C.F.R. §1240.11(c)(1)(i)—refers to two forms of relief that have precise requirements. There would be no point to telling an alien that he might apply for asylum or withholding of removal if the sort of harm he fears has nothing to do with either form of relief.

Jimenez-Aguilar contends that "harm" must be read broadly to prevent the term from being subsumed into "persecution." But we need not read "harm" that way to avoid surplusage. This is because §1240.11(c)(1) requires immigration judges to advise aliens about two forms of relief: they may apply for "asylum in the United States *or withholding of removal*" (emphasis added). One of the ways that an alien be-

comes eligible for withholding of removal is if she can show evidence of "past torture" or "gross, flagrant or mass violations of human rights within the country of removal." 8 C.F.R. §1208.16(c)(3)(i) & (iii). "Torture" or "violations of human rights", for the purposes of the regulation constitute "harm" but are distinct from "persecution" because neither requires that the person harmed belong to a specific identity group. See *Valencia v. Mukasey*, 548 F.3d 1261, 1262 (9th Cir. 2008) ("At a minimum … the alien must express a fear of persecution *or* torture in the country to which the alien would be returned") (emphasis added). "Harm" therefore includes these sorts of dangers that would make a person eligible for withholding of removal but do not qualify as "persecution" for the purpose of asylum. "Harm" also includes the sorts of loss that *could* support asylum if elaborated in response to a warning—if, say, the warning prompted an alien to offer evidence that private violence was being abetted or tolerated by governmental officials.

At least two circuits have concluded that an immigration judge need not always provide notice of a right to apply for asylum or other removal protections whenever "harm" in some broad sense is possible. In *Valencia* the Ninth Circuit held that the record must suggest a "plausible basis" for asylum in order to trigger the IJ's duty. Likewise, the Fifth Circuit determined that those facing removal are not entitled in all cases to notice of their right to apply for asylum, in part because this might produce frivolous claims, which would burden both the government and those with legitimate claims. *Ramirez-Osorio v. INS*, 745 F.2d 937, 946 (5th Cir. 1984) ("[F]rivolous claims not only add administrative burdens but also imperil the identification of non-frivolous claims."). *Valencia* echoed this concern, adding that IJs

should not prompt aliens to submit applications that were bound to be "deemed so meritless as to be 'frivolous'" because such an application may render them "permanently ineligible for benefits under the Immigration and Nationality Act." 548 F.3d at 1264.

A broadly defined duty to inform also would require immigration judges to present potentially contradictory information to aliens appearing before them—many of whom lack the aid of counsel. Jimenez-Aguilar's definition of "harm" would require an IJ to alert an alien to an ability to apply for asylum despite a lack of a plausible basis for relief, and having done so the IJ would also be required by §1240.11(c)(1)(iii) to alert the alien to the consequences of filing a frivolous asylum application. Such a practice risks confusing unrepresented people.

Though we define "harm" in the context of threats that could qualify an alien for asylum or withholding of removal, we reject the government's contention that an alien's eligibility must be "apparent" in order to trigger the IJ's duty to notify. The government correctly points out that a different subsection of the regulation ties the immigration judge's duty to inform an alien about potential benefits to his "apparent eligibility" for those benefits. 8 C.F.R. §1240.11(a)(2). But that subsection concerns applications to be "lawfully admitted for permanent residence", while the subsection at issue here is not similarly limited. Compare §1240.11(a) ("Creation of the status of an alien lawfully admitted for permanent residence."), with §1240.11(c) ("Applications for asylum and withholding of removal."). A more restrictive standard for those seeking permanent residence makes sense, since those persons would have access to benefits that are not

available to those seeking asylum or withholding of removal. Because §1240.11(c)(1) does not state that eligibility must be "apparent," we will not import that requirement from another subsection.

In sum, Jimenez-Aguilar needed only to express fear of persecution or harm of the type that could render him eligible for asylum or withholding of removal. But he did not need to express his fear in a way that would make his eligibility for such relief "apparent."

Jimenez-Aguilar does not contend that he faces danger on account of his race, religion, nationality, or political opinion. Rather, he told the immigration judge that he fears gang violence because his mother received death threats from gangs as a result of her position on a community council that created a neighborhood watch group. His mother testified by affidavit that gangs have threatened and killed members of her community council and their relatives. She expressed fear that her son "is in danger" and that the gang members could "kill him."

We have held that an alien's "nuclear family" qualifies as a "particular social group" for the purposes of asylum. *W.G.A. v. Sessions*, 900 F.3d 957, 965 (7th Cir. 2018). The Attorney General recently issued an opinion stating that membership in a nuclear family group does not necessarily qualify an applicant as a member of a "particular social group." *Matter of L-E-A-*, 27 I. & N. Dec. 581, 594 (A.G. 2019). Neither party has asked us to reconsider *W.G.A.* in light of *L-E-A-*, so we apply *W.G.A.* here. If Jimenez-Aguilar had expressed only a fear of generalized violence in Honduras, as the Board believed, the IJ would not have needed to notify him about the possibility of asylum. But Jimenez-Aguilar

told the IJ that he feared persecution at the hands of gangs in Honduras because of his relationship to his mother, who had received asylum based on these threats. The IJ accordingly should have given the regulatory advice, which could have led to further evidence on topics such as whether the government is complicit in private violence.

Jimenez-Aguilar asserts that he was unaware that he might be eligible for asylum or withholding of removal and seeks remand so he may apply for both forms of relief. This is enough to show that the immigration judge's error prejudiced him.

The petition for review is granted and the proceeding is remanded for a new removal hearing. Other issues that might arise at such a hearing—such as whether Jimenez-Aguilar is disqualified from relief by his long delay in applying, see 8 U.S.C. §1158(a)(2)(B)—must be considered by the IJ and the Board before they are ripe for judicial review.