Balbeer SINGH, Singh Mohan, Mohammed Dawood, Arsalaie Raziq, Ibadullah Sarwary, Nasrullah, Mohammed Akbar Shah, Abdul Wahid, Mohammad Ammer Etimady, Abdul Bari Rafiqi, Fouzia Masoud, Abdul Ghafoor Massoud, Fahima Siddiqi, Mohammad Kabir, Mohammad Daud Ahmadzai, Abdul Samad Momen, Abdul Rashid, Azatullah Nassery, Sunil Kumar Khanna, Charan Jeet Kuchar, Ram Narain Kakar, Mohammad Omar Dildar, Din Mohammad Zahre, Agha Mohammad Rafiqi, Hemraq Ahuja, Shah Mahmood Dildar, Sayed Mohammad Saleh, Najeebullah Woudood, Rahimullah Woudood, Ezatullah Nassery and Freidon Hobbi, Petitioners,

v.

Alan C. NELSON, as Commissioner of the Immigration and Naturalization Service, Charles C. Sava, as District Director of the New York District of the Immigration and Naturalization Service, and Joanne Whittaker, as Deputy Assistant District Director for Detention and Deportation of the New York District of the Immigration and Naturalization Service, Respondents.

No. 85 CIV. 3141 (PKL).

United States District Court,
S.D. New York.

Dec. 12, 1985.

546

Lawyers Committee for Intern. Human Rights, Washington Square Legal Services, Inc., Cahill Gordon & Reindel, New York City, for petitioners; Arthur C. Helton, Nadine Strossen, Steven J. Lee, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for respondents; Michael D. Patrick, Sp. Asst. U.S. Atty., New York City, of counsel.

LEISURE, District Judge:

Petitioners are refugees from Afghanistan held in detention in the custody of the Immigration and Naturalization Service ("INS" or "Service") at the Service Processing Center, 201 Varick Street, New York, New York ("SPC"), pending the completion of exclusion proceedings to determine their admissibility to the United States.[1] Pursuant to 28 U.S.C. § 2241(c) (1982), they challenge the legality of their continued detention under domestic and international law. The parties have agreed that there is no need for discovery or an evidentiary hearing, since all the relevant facts have been presented to the Court by way of affidavits and other documents.

## FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

According to petitioners, they are opponents of the Soviet-backed regime governing Afghanistan. They have actively assisted the Mujahedeen or "freedom fighters" who are resisting the Soviets and the Afghan government. Many were imprisoned and tortured because of their opposition. They fled Afghanistan fearing further persecution. Initially some travelled to Pakistan, then continued to India. In Pakistan and India they were threatened and attacked by agents of the Afghan government and Pakistani Communists. Those who applied, pursuant to 8 U.S.C. § 1157 (1982), for asylum and refugee status at United States embassies in India and Pakistan in order to gain admission to the United States were unsuccessful in such efforts, apparently because they did not have sufficiently close ties to the United States. Applicants abroad who are denied visas are entitled to no further hearing. 8 C.F.R. § 207.4 (1985). *See Wan Shih Hsieh v. Kiley*, 569 F.2d 1179, 1181 (2d Cir.), *cert. denied*, 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 121 (1978).

In desperation they purchased plane tickets and travel documents from people in Pakistan and India and made their way to the United States. At various times from July 10, 1984 to March 20, 1985, petitioners arrived in the United States at John F. Kennedy International Airport from Eng-

---

1. Of the original thirty-one, twenty-eight petitioners remained in detention at the SPC as of June 1985. Three of the original petitioners, including an Iranian, were deported following completion of their exclusion proceedings and denial of their asylum claims. The exclusion proceedings for petitioners Ibadullah Sarwary, Abdul Wahid and Aga Mohammed Rafiq have been completed and the Board of Immigration Appeals has ordered that they be excluded and deported. In a related action, they challenge the legality of the manner in which the Service plans to execute orders of exclusion. *Sarwary v. Sava*, 85 Civ. 4338 (PKL).

land, Holland, Romania, Pakistan and India. Some had travelled through several countries after leaving Afghanistan. Following their arrival here they were inspected pursuant to 8 U.S.C. § 1225 (1982) (Section 235 of the Immigration and Nationality Act ("Act")) to determine whether they were eligible for admission. The inspections revealed "in each case that either, one, they were not in possession of any documents with which to enter the United States or, two, those that did present documents in connection with their applications for admission presented obviously fraudulent ones." Affidavit of J. Scott Blackman, Assistant District Director for Detention, Deportation and Parole of the INS, New York District ¶ 4 ("Blackman Aff."). Several petitioners have admitted in sworn statements that they had used the services of professional smugglers to aid them in their journeys to this country.

After this inspection, each petitioner was deemed excludable pursuant to one or more of the categories set forth in 8 U.S.C. §§ 1182(a)(19), (20) or (26) (1982), as having attempted to enter the United States by means of fraud and willful misrepresentation; as immigrants not in possession of valid unexpired immigrant visas; or as nonimmigrants not in possession of proper documents with which to enter the United States. As a result, each was found to be not clearly admissible under 8 U.S.C. § 1225(b). Section 1225(b) mandates that every alien seeking entry to the United States who does not appear to be "clearly and beyond a doubt" entitled to be admitted shall be detained pending an exclusion hearing. Exclusion hearings are evidentiary hearings held pursuant to 8 U.S.C.

§ 1226 (1982), from which district court judicial review may be sought pursuant to 8 U.S.C. § 1105a(b) (1982). The district court's decision ultimately may be appealed to the Supreme Court. *See generally Louis v. Nelson,* 544 F.Supp. 973, 978 (S.D. Fla.1982), *rev'd and remanded sub nom. Jean v. Nelson,* 727 F.2d 957 (11th Cir. 1984) (en banc), *aff'd,* —— U.S. ——, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

Upon arrival in the United States, petitioners applied, pursuant to 8 U.S.C. § 1158(a) (1982), for political asylum on the grounds that they were refugees and would be persecuted in their home countries. Contrary to petitioners' version of events, the government claims that none of the petitioners applied for asylum until they arrived in the United States.

Following receipt of the asylum claims, advisory opinions on those claims were sought from the Department of State, Bureau of Human Rights and Humanitarian Affairs, pursuant to 8 C.F.R. § 208.10(b) (1985). These regulations provide that hearings before an immigration judge should be held after the State Department renders an opinion. In the cases of at least nineteen petitioners, the State Department and the immigration judges have determined that petitioners had a well-founded fear of persecution or even death upon their return to Afghanistan. Petition ¶ ¶ 28–36, 38–41, 43–48. On that basis deportation was withheld, but the political asylum applications have been denied as a matter of discretion. *Id.* ¶ ¶ 28–36, 38–41, 47–48, 58.[2]

An alien has the right to appeal a decision of an immigration judge to the Board

---

**2.** The decisions to deny asylum apparently were based upon a policy articulated by the Board of Immigration Appeals in *In re Salim,* 18 I. & N.Dec. 311 (BIA 1982). In *Salim,* the Board considered the asylum application of an Afghan fleeing persecution because he refused to join the Soviet controlled Afghan army in its war against the Afghan rebels resisting the Soviet invasion. *Id.* at 313. The Board stated that the public interest required them to look upon the application with disfavor.

   [T]he public interest requires that we do not condone this applicant's attempt to circum-

vent the orderly procedures that our government has provided for refugees to immigrate lawfully. The fraudulent passport was obtained after the applicant escaped from Afghanistan, with the sole purpose of reaching this country ahead of all the other refugees awaiting their turn abroad. This is not the case where an alien was forced to resort to fraudulently obtained documentation in order to escape or prevent being returned to the country in which he fears persecution.

*Id.* at 316.

of Immigration Appeals ("BIA"). 8 C.F.R. §§ 3.1(b)(1) and 236.7 (1985). A BIA decision may be appealed directly to the Circuit Court pursuant to 8 U.S.C. § 1105a(a) or, if the alien is in detention, reviewed by the district court by way of a habeas corpus petition. 8 U.S.C. § 1105a(b). An undocumented excludable alien who chooses to exhaust his right to appeal conceivably could remain in detention for several years. The INS has represented, however, that it is doing whatever is possible to "insure the expeditious conclusion of these proceedings." Blackman Aff. ¶¶ 8 & 9.

On March 5, 1985, the Afghans detained at the SPC pending exclusion proceedings began a hunger strike with the objective of obtaining release from custody. The hunger strike ended on March 14, 1985. As a result of this incident, the INS reviewed the files of the detainees to consider parole requests on a case-by-case basis and determined that three individuals had been released from custody, two had been deported, and the others appeared ineligible for parole release. The District Director withheld his final decision for fifteen days to allow the submission of supplemental information, which was never received. A second hunger strike occurred during the month of September 1985.

### APPLICABLE STATUTES AND REGULATIONS

Petitioners are being detained by authority of the following statutory provisions, regulations and administrative guidelines. Section 235(b) of the Act, 8 U.S.C. § 1225(b), provides that every alien seeking entry to the United States, who does not appear to be clearly and beyond a doubt entitled to be so admitted, shall be detained pending an exclusion hearing. The only exception to detention is through the exercise of the parole authority set forth in 8 U.S.C. § 1182(d)(5) (1982). As set forth in the margin, § 1182(d)(5) permits the Attorney General to parole anyone for emergent reasons or for reasons in the public interest, "but such parole of such alien shall not be regarded as an admission of the alien."[3] A grant of parole therefore does not mean that an excludable alien who is paroled has technically entered the United States. Aliens who have entered the country, even illegally, are considered "deportable" aliens and have greater and different rights than aliens such as petitioners, who, because they were stopped at the airport before they entered the country, are considered "excludable" aliens. In *Jean v. Nelson, supra,* the Eleventh Circuit thoroughly discussed the so-called "entry doctrine fiction" that draws a distinction between the legal status of excludable aliens as compared to the legal status of deportable aliens. 727 F.2d at 967–75.

Criteria for the exercise of the parole authority are set forth by 8 C.F.R. §§ 235.3(b) & (c) and 212.5(a) (1985), and the Service's Detention Policy Guidelines of June 27, 1983. Section 235.3(b) provides in relevant part:

> *Aliens with no documentation or false documentation.* Any alien who appears to the inspecting officer to be inadmissible, and who arrives without documents ... or who arrives with documentation which appears on its face to be false, altered, or to relate to another person, ... shall be detained in accordance with

**3.** Section 1182(d)(5) provides as follows:

(A) The Attorney General may, except as provided in subparagraph (B), in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States. (B) The Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title.

section 235(b) of the Act. Parole of such aliens shall only be considered in accordance with § 212.5(a) of this chapter.

According to 8 C.F.R. § 235.3(c), an alien who appears to be inadmissible, but who has valid documentation may be detained, paroled, or paroled for deferred inspection. "In determining whether or not an alien shall be detained, paroled or paroled for deferred inspection, the inspecting officer shall consider the likelihood that the alien will abscond or pose a security risk." *Id.*

Section 212.5(a) provides that in determining whether to parole an alien, the district director should consider the following:

(1) The parole of aliens who have serious medical conditions in which continued detention would not be appropriate would generally be justified by "emergent reasons";

(2) The parole of aliens within the following groups would generally come within the category of aliens for whom the granting of the parole exception would be "strictly in the public interest", provided that the aliens present neither a security risk nor a risk of absconding:

(i) Women who have been medically certified as pregnant;

(ii) Aliens who are defined as juveniles . . .;

(iii) Aliens who have close family relatives in the United States . . .;

(iv) Aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States;

(v) Aliens whose continued detention is not in the public interest as determined by the district director.

(3) Aliens subject to prosecution in the United States who are needed for the purposes of such prosecution may be pa-roled to the custody of the appropriate responsible agency or prosecuting authority.

■ Certain of these categories are based upon the parole statute's legislative history and the administrative experience of the INS. 47 Fed.Reg. 30,044–45 (1982). For example, the House Report that accompanied passage of the Act described the discretionary authority vested in the Attorney General in the following terms.

> The committee believes that the broader discretionary authority is necessary to permit the Attorney General to parole inadmissible aliens into the United States in emergency cases, such as the case of an alien who requires immediate medical attention before there has been an opportunity for an immigration officer to inspect him, and in cases where it is strictly in the public interest to have an inadmissible alien present in the United States, such as, for instance, a witness or for purposes of prosecution.

H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Ad. News 1653, 1706. The legislative history of the Act and its amendments demonstrate that parole should be granted only in emergent, individual and isolated situations.[4]

In cases involving deportable aliens, the Attorney General is authorized to withhold deportation of any alien to any country in which the alien would be subject to persecution on account of race, religion or political opinion. 8 U.S.C. § 1253(h)(1) (1982). The Act also requires the Attorney General to effect within six months the departure of any alien against whom a final order of deportation has been made. 8 U.S.C. § 1252(c) (1982). During the six-month period, the Attorney General may, in his dis-

---

4. "The parole provisions were designed to authorize the Attorney General to act only in emergent, individual, and isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside of the limit of the law." S.Rep. No. 748, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Ad.News 3328, 3335. *See also* 111 Cong.Rec. 21,586–87

(1965) (Remarks of Rep. Feighan) ("The original intent of section 212 of the law was to cover individual cases only and then only in emergent circumstances."); S.Rep. No. 256, 96th Cong., 2d Sess. 17, *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 157; H.Conf.Rep. No. 781, 96th Cong., 2d Sess. 20, *reprinted in* 1980 U.S.Code Cong. & Ad.News 141, 160, 161–62.

cretion, detain or release the alien on bond or on such other conditions as may be prescribed. In cases involving excludable aliens, the June 27, 1983 Guidelines provide:

> [A]liens detained in exclusion proceedings for more than thirty days after a request for travel facilities to the Department of State, and in whose cases a final order [of exclusion] has been entered, may be considered for parole under bond or recognizance on a case by case basis. This policy would apply only to those cases where there are difficulties in enforcing departure or where it is perceived that departure cannot be enforced.

Considered together, the regulations and guidelines require the detention of undocumented excludable aliens until such time as a final order of exclusion is entered. At that time, they are eligible for release on parole on the same basis as any other aliens in the event the State Department is unable to transport them to a foreign country in a timely fashion.

The prospect of prolonged incarceration in the SPC has caused several Afghans to waive their right to appeal adverse asylum decisions in order to be eligible for release under the June 27, 1983 Guidelines. *See* Petition ¶ 24 and the Affidavits of Mohammad Ishtyaq Khugiani; Sayed Mohammad Saleh; Shah Mahmood Dildar (2) and Nazar Mohammed Akhtar. Petitioners claim that those Afghans who have been released have complied with parole conditions set by the Service. *See* Affidavit of Vanessa Wendenburg.

**5.** The regulations at issue in this case have not been the subject of legal challenges on the precise grounds asserted here. In *Jean v. Nelson, supra,* the change of parole policy for undocumented excludable aliens was challenged as contrary to the notice-and-comment rulemaking procedures of the Administrative Procedure Act, 5 U.S.C. § 553. *See* 105 S.Ct. at 2995. The Supreme Court found it unnecessary to reach the constitutional issue raised in the pleadings because the *current* statutes and regulations provided the petitioners therein with the opportunity for nondiscriminatory parole consideration. *Id.* at 2998. In *Ishtyaq v. Nelson,* 627 F.Supp. 13 (E.D.N.Y.1983), the regulations were challenged unsuccessfully on the grounds that they re-

## PETITIONERS' LEGAL CLAIMS

### Abuse of Discretion

Petitioners challenge their incarceration on several grounds, the first of which is that the detention regulations impermissibly restrict the Attorney General's discretion under 8 U.S.C. § 1182(d)(5) to "parole" into the United States "any alien applying for admission."[5] Petitioners contend that the detention regulations irrationally deny release to undocumented excludable aliens because lack of travel documents alone is not dispositive of whether or not release is warranted. Petitioners do not claim the right to remain in the United States. Their applications for political asylum and their efforts to resist exclusion and deportation are the subject of separate proceedings. The relief they seek in this action is very limited and narrow. They seek only to be considered for release by the Service according to the traditional administrative criteria of whether they will abscond or pose a security risk. If not, they ask that they be released. They seek full discretionary consideration of their parole applications without what they construe to be the categorical bar to release erected by the regulations.

██ Congress has plenary power to make rules for the admission of aliens and to exclude those who possess characteristics which Congress has forbidden. *Kleindienst v. Mandel,* 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972). Congress has exercised this plenary au-

quired mandatory imprisonment contrary to Congressional intent and that they were arbitrary and capricious. In *Ledesma-Valdes v. Sava,* 604 F.Supp. 675 (S.D.N.Y.1985), the parole denial was held not to be an abuse of discretion based upon prior escapes by similarly situated persons. The validity of the regulations was not challenged. In *Abu Laban v. Sava,* 564 F.Supp. 30 (S.D.N.Y.1982), the regulations were not challenged and a specific finding was made that petitioners posed a risk of absconding. In *Paulis v. Sava,* 544 F.Supp. 819 (S.D.N.Y.1982), the predecessors to these regulations were challenged on grounds similar to those raised in *Jean v. Nelson. Id.* at 820.

thority over immigration matters by granting to the Attorney General of the United States broad discretionary powers to parole unadmitted aliens into the United States on a temporary basis. *Bertrand v. Sava*, 684 F.2d 204, 212 (2d Cir.1982). Nevertheless, the Court has the authority to consider a petition for a writ of habeas corpus which challenges the detention of an unadmitted alien. *Id.* at 210. While a court will not second-guess the Attorney General's exercise of discretion so long as the discretionary power is exercised "on the basis of a facially legitimate and bona fide reason," *id.* at 212 quoting *Kleindienst v. Mandel*, 408 U.S. at 770, 92 S.Ct. at 2585, a court may consider whether in denying a request for discretionary relief discretion was not exercised. *See Petition of Cahill*, 447 F.2d 1343, 1344 (2d Cir.1971); *Bertrand v. Sava*, 684 F.2d at 210 n. 9.

■ The exercise of this broad discretion must be viewed at the outset as presumptively legitimate, and petitioners bear the heavy burden of proving that the discretion has not been exercised, or was exercised irrationally or in bad faith. *Id.* at 212–13. In the context of this case, the Court is mindful that a decision of the Attorney General may not be challenged on the grounds that the discretion was not exercised fairly or that too much weight was given to certain factors relevant to the risk of absconding or too little to others. *Id.* at 212. However, the discretion may not be exercised to depart without rational explanation from established policies. *Id.*

■ Petitioners contend that 8 C.F.R. §§ 235.3(b) & (c) and 212.5(a) impermissibly preclude the district director from considering an alien for release according to administrative criteria traditionally used to determine whether an alien poses a security risk or threat of absconding. They argue that the regulations in question impose a blanket condition for release on parole which inherently precludes an individualized determination of a parole application. *See, e.g., National Center for Immigrants Rights, Inc. v. INS*, 743 F.2d 1364, 1370–71 (9th Cir.1984); *National Center for Immi-*

*grants' Rights, Inc. v. INS*, No. CV 83–7972 (C.D.Cal. Mar. 7, 1985) (regulation barring aliens from working during the course of deportation proceedings held invalid because it precluded individual determination of whether the parole condition was appropriate). If this contention were true, the regulations would be at odds with the requirement that in exercising discretion under § 1182(d)(5)(A), INS officials must "make individualized determinations of parole." *Jean v. Nelson*, 105 S.Ct. at 2999. *See* note 5, *supra*.

Although the INS has described the detention regulations as "a formal restatement of the policies and practices it has always followed," *Paulis v. Sava*, 544 F.Supp. 819, 820 (S.D.N.Y.1982), and as merely codifying "existing Service practices," 47 Fed.Reg. 46,494 (1982), they are more restrictive than the pre-1982 parole practices that were examined and discussed by the Second Circuit in *Bertrand v. Sava, supra*. In *Bertrand* a lack of travel documents was only one of eight relevant factors the Service considered in deciding whether an alien would be likely to abscond if paroled. The other factors included the alien's likelihood of success on his application for admission, his prior immigration history, financial ability to support himself while on parole, sponsorship by a family member or organization, and the ability to post a security bond. 684 F.2d at 214. These are the criteria applied when considering the parole applications of all aliens other than undocumented excludable aliens.

■ In this case, the Service has stated that the criteria set forth in the regulations and guidelines "are the sole criteria under which the requests for release may be considered and are the criteria under which petitioners' requests were considered." Blackman Aff. ¶ 14. This statement confirms the contention that in cases of undocumented excludable aliens, the regulations preclude the Service from applying the type of release criteria described by the Second Circuit in *Bertrand v. Sava*. The

INS contends, however, that each parole application in this case was considered on a case-by-case basis, and that each petitioner was afforded an opportunity to demonstrate that he did not pose a threat to security or a threat of absconding and came within one of the five categories of persons who are entitled to release. *Id.* ¶ 15. The Service takes the position that such a review fulfills the statutory mandate that parole applications receive individualized consideration.

The pivotal regulation, 8 C.F.R. § 212.-5(a)(2) does enumerate sub-categories of aliens for whom parole would be in the public interest, provided that the aliens present neither a security risk nor a risk of absconding. The Service argues that the "catchall" in § 212.5(a)(2)(v) provides an opportunity for parole for persons who do not come within the other enumerated categories, citing Justice Marshall's dissent in *Jean v. Nelson*, — U.S. —, 105 S.Ct. 2992, 3001, 86 L.Ed.2d 664 (1985) as authority. Justice Marshall noted, however, that the regulations "provide somewhat tautologically that it would generally be 'strictly in the public interest' to parole aliens whose continued detention is not 'in the public interest'". *Id.* He described the list of criteria appearing in § 212.5(a)(i)–(iv) as "in fact an empty set," concluding that the "the regulations do not provide either exclusive criteria to guide the 'public interest' determination or a list of impermissible criteria." *Id.*

■ Nevertheless, consistent with the requirement that parole applications should receive individual consideration, under certain circumstances regulations may identify groups of individuals that are ineligible for discretionary relief. Under principles of administrative law, a regulation which makes a class of individuals ineligible for discretionary relief is not permissible unless the class is rationally distinguishable from all other classes of individuals who remain eligible for discretionary relief. *Mastrapasqua v. Shaughnessy*, 180 F.2d 999, 1002 (2d Cir.1950). *See also United States ex rel. Stellas v. Esperdy*, 366 F.2d

266, 270 (2d Cir.1966) ("if the class created is susceptible of rational differentiation, then there is an exercise of discretion in following the rule"), *vacated and remanded on other grounds*, 388 U.S. 462, 87 S.Ct. 2121, 18 L.Ed.2d 1322 (1967). This principle was amplified by the Second Circuit in *Fook Hong Mak v. INS*, 435 F.2d 728 (2d Cir.1970).

> [A]n administrator, vested with discretionary power, [may] determine by appropriate rulemaking that he will not use it in favor of a particular class on a case-by-case basis, if his determination is founded on considerations rationally related to the statute he is administering. The legislature's grant of discretion to accord a privilege does not imply a mandate that this must inevitably be done by examining each case rather than by identifying groups. The administrator also exercises the discretion accorded him when, after appropriate deliberation, he determines certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration, regardless of other factors that otherwise might tend in their favor. He has then decided that one element is of such determinative negative force that no possible combination of others could justify an affirmative result.

*Id.* at 730.

Petitioners contend that elevating lack of travel documents to a dispositive level is irrational and in conflict with the statutory and regulatory scheme of the immigration laws. For example, the Attorney General may exercise discretion in favor of undocumented aliens by withholding deportation and granting parole under 8 U.S.C. § 1253(h), or by granting political asylum under 8 U.S.C. § 1158(a). The very regulations at issue in this case recognize that for certain categories of aliens, lack of documents should not affect their eligibility for parole. 8 C.F.R. § 212.5(a). Under 8 U.S.C. § 1182(d)(4), passport and visa requirements may be waived under certain circumstances. The June 27, 1983 Guide-

lines would permit petitioners to be paroled once they have received final exclusion orders and it is determined that transportation to a foreign country cannot be arranged within thirty days. Based upon this statutory scheme, past administrative experience,[6] and current practice with respect to all aliens other than undocumented excludable aliens, petitioners argue that the INS does not consider lack of documents to be a dispositive negative factor in parole decisions. Thus, the Attorney General could not conclude reasonably that lack of documents is of "such determinative negative force that no possible combination" of other factors could outweigh it. *Fook Hong Mak*, 435 F.2d at 730.

This argument, while it has superficial appeal, is unpersuasive. It ignores the fact that the provisions referred to above apply only when there has already been a determination of the alien's status or where special circumstances exist that justify such release. None of those circumstances apply in this case. Furthermore, as I discuss more fully below, there is a rational basis for concluding that lack of documents is a dispositive characteristic.

The INS argues that the document distinction has a significant basis because it "permits the INS to determine an alien's identity and it is much more difficult for an accurately identified alien to abscond while paroled." *Bertrand v. Sava*, 684 F.2d at 217 n. 16. "[D]ocumented aliens have been through a screening process at a United States consular office abroad and have had their identities and histories examined and verified." *Vigile v. Sava*, 535 F.Supp. 1002, 1008 (S.D.N.Y.), *rev'd on other grounds sub nom. Bertrand v. Sava*, 684 F.2d 204 (2d Cir.1982).

This argument, however, appears to prove petitioners' point. According to the INS, the purpose of the documentation

requirement is to establish the alien's identity. This information would make it more difficult for the alien to successfully abscond. Presumably, however, petitioners, some of whom have been in detention for over eighteen months, have been identified during the course of their asylum and exclusion proceedings and have had their histories examined and verified.[7] The very purpose of the documentation distinction would no longer exist in such situations. If detention continues after identification has been made, the detention regulations may become punitive in nature. Criminal penalties already exist in the immigration laws for persons who enter the United States through the use of false documents or misleading representations. *See, e.g.,* 8 U.S.C. § 1325 (1982); 18 U.S.C. § 1542 (1982). The argument that detention of petitioners is tantamount to a penalty would be persuasive, except for the legal fiction that detention is considered a continuation of the exclusion process and therefore is not punitive. *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1387 (10th Cir.1981).

However inconsistent this situation may be, it does not justify granting petitioners the relief they seek. I must consider whether the distinction that has been made between undocumented excludable aliens and other groups of aliens is "rationally related to the statute [the Attorney General] is administering." *Fook Hong Mak*, 435 F.2d at 730. Petitioners have argued that detention should be imposed only in exceptional circumstances and it "is simply a device through which needless confinement is avoided while administrative proceedings are conducted." *Leng May Ma v. Barber*, 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958). This statement of the Supreme Court, however, was based upon an expression of policy

---

6. Petitioners claim that before the Service changed its policy, similarly situated Afghans, such as the *Ishtyaq* and *Bertrand* Afghans, were released and the INS has experienced no problems of absconding or other difficulties with these persons, or those Afghans released pursuant to the June 27, 1983 Guidelines.

7. Apparently, identification in this manner was deemed sufficient by the Service and the Second Circuit in *Bertrand v. Sava* to categorize certain aliens as "documented" rather than being considered "undocumented". 684 F.2d at 216.

issued by the Service in 1955. *Id.* at 190, 78 S.Ct. at 1075.[8] It was not a statutory interpretation that has the force of binding precedent, although some courts appear to have treated it in that way. *See, e.g., Vigile v. Sava*, 535 F.Supp. at 1009–10 & n. 9.

As the result of changed circumstances during the intervening twenty-five-year period, the Service's parole policy has become far more restrictive. *Jean v. Nelson*, 105 S.Ct. at 2995. The purpose behind this policy change is to deter persons from attempting to enter the United States illegally. 47 Fed.Reg. 30,044 (1982). The restrictions imposed on parole eligibility for undocumented excludable aliens such as petitioners is related to the Service's attempt to stem the flow of undocumented aliens arriving in the United States by airplane or ship. By refusing to parole undocumented excludable aliens, the Service is attempting to discourage people from entering the United States without permission and serves notice that aliens will not be able to circumvent the procedures governing lawful immigration to this country. *Cf. In re Salim*, 18 I. & N. Dec. 311, 316 (BIA 1982). This goal provides a rational basis for distinguishing among categories of illegal aliens. *Cf. Jean v. Nelson*, 105 S.Ct. at 3011. (Marshall, J., dissenting).[9]

An example of a seemingly arbitrary distinction that was found to be related to a valid immigration purpose is provided by *Fook Hong Mak*, where the Second Circuit held it was proper for the Service not to consider applications for adjustment of status from persons who were in immediate and continuous transit. The Service successfully argued that merely entertaining such applications would encourage others to seek admission under the pretense of continuous transit and then remain in this country for years. *Id.* at 731. Similar concerns are at the heart of the Service's regulations at issue here. Such considerations are rationally related to the purposes of the immigrations laws in general and the exclusion statute, 8 U.S.C. § 1182, in particular. Accordingly, it is this Court's determination that the distinctions made by the regulations have a rational basis and do not amount to an abuse of discretion on the part of the Attorney General.

### Refugee Act of 1980

Petitioners next argue that the detention regulations frustrate the purpose of the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 102. The Refugee Act established the right of any alien physically present in the United States or at a land border or port of entry to apply for asylum. 8 U.S.C. § 1158(a) (1982). This section was added to the Refugee Act because of a Congressional desire "to insure a fair and workable asylum policy which is consistent with this country's tradition of welcoming the oppressed of other nations and with our obligations under international law." H.R. Rep. No. 608, 96th Cong., 1st Sess. 17–18 (1979). Petitioners contend that by creating a fear of detention the INS hopes to deter undocumented aliens from coming to the United States to seek asylum. According to the *Handbook on Procedures and Criteria for Determining Refugee Status* (1979) published by the United Nations High Commissioner for Refugees, it is often true that "a person fleeing from persecution will arrive with the barest necessi-

---

**8.** Until 1954 detention was the the common practice. *See Louis v. Nelson*, 544 F.Supp. at 980 n. 18.

**9.** In discussing the constitutionality of discriminating against Haitians in the immigration context, Justice Marshall made the following comments.

It is clear that, consistent with our constitutional scheme, the Executive enjoys wide discretion over immigration decisions. Here, the Government would have a strong case if it showed that (1) refusing to parole Haitians would slow down the flow onto United States shores of undocumented Haitians, and that (2) refusing to parole other groups would not have a similar deterrent effect. Then, its policy of detaining Haitians but paroling other groups might be sufficiently related to the valid immigration goal of reducing the number of undocumented aliens arriving at our borders to withstand constitutional scrutiny. 105 S.Ct. at 3011.

ties and very frequently even without personal documents." *Id.* ¶ 196. Petitioners contend that efforts to deter such individuals particularly affect the "oppressed of other nations" for whom Congress established the right to seek asylum.

It is argued that the length of time it takes to process an asylum application penalizes detained asylum applicants. Indeed, the lengthy proceedings and prolonged periods of imprisonment have induced several petitioners to withdraw their claims for admission in order to become eligible for parole. Petitioners argue that the burden the regulations place on detained asylum applicants demonstrates that the detention regulations are at odds with purpose of the Refugee Act. Moreover, other undocumented aliens, such as deportable aliens who have "entered" this country, do not face the prospect of prolonged incarceration during the asylum application process as do petitioners. This differentiation, petitioners argue, conflicts with the requirement that all aliens be treated equally in the application process "irrespective of ... status." 8 U.S.C. § 1158(a).

The Service argues that the primary purpose of the regulations is not to deter aliens from lawfully emigrating but to assist the Service in upholding its obligations to enforce the immigration laws. In addition, the regulations are consistent with Congressional intent to eliminate use of the parole statute as a means of granting refuge and to replace it with a uniform asylum application process. *See INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 2498–99, 81 L.Ed.2d 321 (1984).

In his decision in *Ishtyaq v. Nelson,* 627 F.Supp. 13 (E.D.N.Y.1983), Judge Sifton held that the regulations did not operate in a manner that was contrary to Congressional intent. The original intent of the parole statute was not to cover immigrant groups and "certainly not refugees." 111 Cong.Rec. 21,586 (1965) (Remarks of Rep. Feighan).[10] According to the Refugee Act's legislative history, the Attorney General's parole authority under 8 U.S.C. § 1182(d)(5) "remains unchanged" and the "Attorney General does not anticipate using his authority with respect to refugees unless he determines that compelling reasons in the public interest ... require that they be paroled ... rather than be admitted in accordance with proposed Sections 207 or 208." S.Rep. No. 256, 96th Cong., 2d Sess. 17, *reprinted in* 1980 U.S. Code Cong. & Ad.News 141, 157. *See also* H.Conf.Rep. No. 781, 96th Cong., 2d Sess. 20, *reprinted in* 1980 U.S.Code Cong. & Ad.News 160, 161. Indeed, subsection (B) was added to the parole statute to make it clear that refugees potentially eligible for admission pursuant to § 207 should not be paroled unless "compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States." 8 U.S.C. § 1182(d)(5)(B). This provision was added to restrict the Attorney General's parole power with respect to admitting groups of refugees, H.R.Rep. No. 608, 96th Cong., 1st Sess. 30 (1979), but it makes clear the intent that a refugee may be paroled only "for compelling reasons." 8 U.S.C. § 1182(d)(5)(B).

Petitioners argue that the "irrespective of ... status" language means that Congress intended all asylum applicants to have the same procedural opportunities regarding their asylum petitions. Consequently, based upon *Yiu Sing Chun v. Sava,* 708 F.2d 869, 874 (2d Cir.1983), they argue asylum applicants like petitioners should not receive disfavored treatment because of their immigration status. The *Chun* decision should not be given such an expansive reading, however. In *Chun,* the district court upheld the district director's

---

**10.** Representative Feighan further clarified the scope of the parole authority in the context of the 1965 amendments to the Immigration and Nationality Act.

The Attorney General is not given authority to parole refugees into the United States.

The parole provision of the law is returned to its original intent.

Refugees will not be paroled into the United States under the pending bill.

111 Cong.Rec. 21,587 (1965).

decision denying applications for asylum and parole by two stowaways. He concluded that the applicants were not entitled to renew their asylum applications before an immigration judge for two reasons. First, the jurisdiction of the immigration court was circumscribed by 8 U.S.C. § 1323(d), which denies exclusion hearings to stowaways. Second, the hearing requirement of the asylum regulations did not apply to stowaways. *Id.* at 872.

In reversing the lower court, the Second Circuit held that the "irrespective of ... status" language of 8 U.S.C. § 1158(a) entitled stowaways to a hearing before an immigration judge, although the hearing would be limited to the asylum claims "followed by whatever other procedural rights other asylum applicants are afforded." 708 F.2d at 876. This ruling was the result of an effort to reconcile apparently conflicting provisions of "the same legislative tapestry." *Id.*

> Because the hearing we require will be limited solely to the issue of asylum eligibility, we preserve the basic thrust of § 1323(d)'s command that stowaways are not entitled to exclusion hearings. As stowaways, the petitioners are entitled to nothing more; as asylum seekers at our border, they are entitled to nothing less.

*Id. See also Nunez v. Boldin,* 537 F.Supp. 578, 584 (S.D.Tex.) (treaty, statute and regulations manifest an intent to create a privilege of having asylum pleas *heard*), *appeal dismissed,* 692 F.2d 755 (5th Cir.1982).

■ The petitioners in this case have had their asylum applications considered by immigration judges. They also have had the opportunity to avail themselves of the subsequent procedural rights that are afforded to all other asylum applicants. The fact that they are detained while such procedural steps are taken does not negate those facts. In addition, according to the legislative history, Congress contemplated that asylum applicants would be detained while their applications were pending. *See* S.Rep. No. 256, 96th Cong., 2d Sess. 17,

*reprinted in* 1980 U.S.Code Cong. & Ad. News 141, 157.

■ Based upon the Second Circuit's ruling in *Chun,* it is this Court's determination that petitioners have been afforded the same procedural opportunities regarding their asylum applications that are available to all other asylum applicants. Although the lengthy process of pursuing an asylum application may present petitioners with the discouraging prospect of prolonged incarceration, such detention is not inconsistent with the right to apply for asylum created by the Refugee Act.

### The Due Process Clause

Petitioners next claim that their continued incarceration pursuant to the regulations, without a showing that their detention is necessary to effect their deportation or to protect society, violates the Fifth Amendment's Due Process Clause.[11] Petitioners acknowledge that it is only in the admissions process that their status as excludable aliens limits their Constitutional rights. *See Plyler v. Doe,* 457 U.S. 202, 212 n. 12, 102 S.Ct. 2382, 2392, 72 L.Ed.2d 786 (1982). Nevertheless, they argue that detention of aliens has been approved only as a means of effecting exclusion and deportation or to protect society from excludable or deportable aliens found to be security risks. This requires the Service to demonstrate that incarceration of petitioners is necessary to effect their deportation or that petitioners would pose a danger to society if released.

■ It is well settled that aliens such as petitioners who seek entry into the United States have no constitutional right to do so. *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982); *Bertrand v. Sava, supra,* 684 F.2d at 211–12. Furthermore, an unadmitted alien has no constitutional right to parole. *Ledesma-Valdes v. Sava,* 604 F.Supp. 674, 680 (S.D. N.Y.1985) (Weinfeld, J.). *But see Paulis v. Sava,* 544 F.Supp. 819, 821 (S.D.N.Y.1982) (Constitution imposes an outer limit on the

---

**11.** The Fifth Amendment provides in pertinent part that "no person shall be deprived of ... liberty ... without due process of law." U.S. Const., Amend. V.

length of time that the government can detain an alien while his case is processed).[12] Although these cases would allow the Court quickly to dispose of petitioners' due process claims, especially since the regulations do not amount to an abuse of discretion, a brief treatment of a theory that pervades the legal arguments advanced by petitioners in this case would be appropriate.

When there is the prospect of indefinite detention of an excludable alien, it has been argued that at some point in time continued incarceration violates fundamental notions of due process and fairness. In such a situation, as petitioners argue, the INS should be required to justify continued detention of aliens. *See, e.g., Rodriguez-Fernandez v. Wilkinson,* 654 F.2d 1382, 1387 (10th Cir.1981); *Louis v. Nelson, supra,* 544 F.Supp. at 978 n. 14. This question was considered by the Eleventh Circuit in *Jean v. Nelson, supra,* 727 F.2d at 967–75, where the Court ultimately held that "excludable aliens … have no constitutional rights with respect to their applications for admission, asylum, or parole." *Id.* at 984. The Supreme Court, however, found it unnecessary to address this constitutional issue in affirming the Circuit Court's remand of the case to the district court, since the statutes and regulations provided the opportunity for nondiscriminatory parole consideration. 105 S.Ct. at 2998. Because the issue is squarely before this Court, the reasoning employed by the Eleventh Circuit compels careful consideration and evaluation.

■ A determinative factor in the conclusion reached by the Eleventh Circuit

was that the power of the political branches of the government to regulate the admission of aliens is, to use the words of the Second Circuit, derived from "the nation's sovereignty, Congress' power over foreign commerce and the President's power to control foreign affairs." *Bertrand v. Sava,* 684 F.2d at 211 n. 11. *See Jean v. Nelson,* 727 F.2d at 975. The Eleventh Circuit held that requiring the government to meet some judicially-imposed standard in order to continue the alien's detention would negate the plenary authority of the political branches in the exclusion area. *Id.*

> The prospect of indefinite confinement, after all, can be raised by the refusal of an excludable alien to return home, or the refusal of his country of origin or any other country to accept him.

*Id.* If, at some time during the detention period, the alien could require the Service to justify further detention pursuant to a judicially-imposed standard, control over this nation's borders ultimately would be lost. *Id.* The Eleventh Circuit's caution in not taking judicial action "that would inhibit the flexibility of the political branches of government to respond to changing world conditions," *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976), is well taken and applicable in this case. For this reason and the reasons presented above, petitioners' due process claim is denied.[13]

*The United Nations Protocol Relating To The Status Of Refugees*

Next, petitioners allege that the regulations violate Article 31 of the United Na-

---

**12.** In *Paulis v. Sava,* petitioner, an excludable alien, had argued that it was "inhuman" to keep him in custody for over four months pending an appeal from a denial of a request for asylum. 544 F.Supp. at 820. The Court held that petitioner was not entitled to be paroled during the time an appeal was pending. *Id.* at 821. Judge Lasker ordered, however, that because "the Constitution imposes some outer limit on the length of time that he can be detained while the government processes his case," the INS had to accord petitioner's appeal full priority and dispose of it promptly. *Id.* This argument has not been advanced by petitioners.

**13.** The Second Circuit has recognized that a limited due process interest exists on the part of an asylum applicant that is not available to an alien claiming admission only. *Azzouka v. Sava,* 777 F.2d 68, 75 (2d Cir.1985); *Augustin v. Sava,* 735 F.2d 32, 37 (2d Cir.1984); *Yiu Sing Chun v. Sava,* 708 F.2d 869, 877 (2d Cir.1983). But that limited due process requirement has been met in this case since petitioners have had the opportunity to present their asylum applications to immigration judges and to appeal their decisions.

tions Convention Relating to the Status of Refugees, 189 U.N.T.S. 150 (July 28, 1951) (the "Convention"), which is incorporated by the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967 (the "Protocol"), a treaty to which the United States has acceded. [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577.[14] Petitioners claim that Article 31 is a self-executing treaty provision and therefore has the same authority as federal statutes under United States law. They contend that the lengthy periods of detention they have had to endure amount to a penalty under Article 31(1), which forbids the imposition of penalties on refugees by reason of their illegal entry. Furthermore, because there has been no showing that they will abscond or pose a threat to society, the detention policy imposes an unnecessary restriction on their movement in violation of Article 31(2).

The Service argues that the Protocol and the Convention do not grant any rights or privileges not provided for in the Immigration Act or the Refugee Act of 1980. More persuasive, however, is the Service's contention that petitioners may not invoke Article 31 of the Protocol because it applies only to "refugees who[ ] com[e] directly from a territory where their life or freedom was threatened." In this case, all petitioners came to the United States from various countries. Not one came directly from Afghanistan.

■ The Service has argued correctly that the language of Article 31 must be taken literally. The debates at the United Nations General Assembly Conference on the Status of Refugees and Stateless Persons that drafted the Convention indicate that exemption from the consequences of an illegal entry should be considered only in the case of the first receiving country. United Nations General Assembly, Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons (Agenda Item 5(a)) ("U.N. Refugee Conference"), Summary Record of the Thirteenth Meeting, at 13–15 (July 10, 1951) (U.N. Doc. A/Conf.2/SR.13). An interim draft of Article 31(1) did provide that no penalties by reason of an illegal entry shall be imposed "on a refugee who, being unable to find asylum even temporarily in a country other than one in which his life or freedom would be threatened enters" a third country. U.N. Refugee Conference, Draft Convention Relating to the Status of Refugees, Text of Articles Adopted on July 10, 1951 (U.N. Doc. A/Conf.2/L.1 Add.3). This amendment, as adopted, modified one proposed by France that prohibited the imposition of penalties due to illegal entry "on a refugee coming direct from his country of origin." U.N. Refugee Conference, Draft Convention Relating to the Status of Refugees, France—Amendment to Article 26 (U.N. Doc. A/Conf.2/62).[15]

On the last day of the Conference, however, a further amendment was made due to the unwillingness of the French representative "to agree that refugees entering from intermediate countries should be included." U.N. Refugee Conference, Summary Record of the Thirty-Fifth Meeting, at 16 (July 25, 1951) (Remarks of Mr. Hoare) (U.N. Doc. A/Conf.2/SR.35) "Each country had to accept its frontier responsibilities, but the fact that an intermediate country refused to face its own could not

**14.** Article 31 states:

1. The Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened ..., enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

2. The Contracting States shall not apply to the movements of such refugees restrictions other than those which are necessary and such restrictions shall only be applied until their status in the country is regularized or they obtain admission into another country. The Contracting States shall allow such refugees a reasonable period and all the necessary facilities to obtain admission into another country.

**15.** Article 31 was renumbered from Article 26 in the final version of the Convention. *See* U.N. Refugee Conference, Summary Record of the Thirty-fifth Meeting at 10 (July 25, 1951) (U.N. Doc. A/Conf.2/SR.35).

deprive a third country of the right to take precautions against illegal entry." *Id.* at 17 (Remarks of Mr. Rochefort).

■ The Conference debates also make it plain that the word "penalties" in ¶ 1 of Article 31 referred to "penalties imposable for the unlawful crossing of a frontier.... The government concerned would nevertheless retain its right to expel an alien who had entered its territory illegally." U.N. Refugee Conference, Summary Record of the Thirteenth Meeting, at 14 (July 10, 1951) (Remarks of Mr. Herment) (U.N. Doc. A/Conf.2/SR.13). Article 31 was not intended to "prevent a government detaining a person who entered the country illegally, pending a decision whether that person was to be regarded as a *bona fide* refugee. It would merely prevent his being punished for such illegal entry if the decision went in his favor." U.N. Refugee Conference, Summary Record of the Thirty-Fifth Meeting, at 12 (July 25, 1951) (Remarks of Mr. van Heuven Goedhart [U.N. High Commissioner for Refugees]) (U.N. Doc. A/Conf.2/SR.35). It was also contemplated that in aid of its efforts to investigate the circumstances in which a refugee had entered a country, the government could detain and keep him in custody. U.N. Refugee Conference, Summary Record of the Fourteenth Meeting, at 15 (July 10, 1951) (Remarks of Mr. Larsen) (U.N. Doc. A/Conf.2/SR.14); Summary Record of the Thirty-Fifth Meeting, at 12–13 (July 25, 1951) (U.N. Doc. A/Conf.2/SR.35).

■ The debates also refute petitioners' argument that the limitation imposed by ¶ 1 of Article 31 is inapplicable to ¶ 2. Paragraph 2 of Article 31 prohibits the application of restrictions on the movement of "such refugees," which the drafters intended to refer to the type of refugees defined in ¶ 1 of Article 31. "The first provision of paragraph 2 of the ... text of Article [31] meant that Contracting States should not apply to the refugees referred to in paragraph 1 restrictions on movement other than those which were necessary." U.N. Refugee Conference, Summary

Record of the Fourteenth Meeting, at 15 (July 10, 1951) (Remarks of Mr. Larsen) (U.N. Doc. A/Conf.2/SR.14).

■ This review of the "legislative history" of the Convention indicates that the Protocol and the Convention do not apply to petitioners under the circumstances of this case. It is therefore unnecessary for the Court to address the question whether the Protocol and the Convention are, in whole or in part, self-executing treaties, as petitioners have argued. In addition, the Court need not consider the issue whether the use of fraudulent documents and other misrepresentations by some of the petitioners violated the proviso of Article 31(1) that "they present themselves without delay to the authorities and show good cause for their illegal entry or presence."

*Customary International Law*

Lastly, petitioners argue that the parole regulations violate principles of customary international law and the Protocol by permitting "arbitrary and purposeless detention." Customary international law is "the law of the political community of States developed by the practice of States and modified by State treaties." Henkin, *International Law as Law in the United States,* 82 Mich.L.Rev. 1555, 1559 (1984).

■ It has already been determined that the parole regulations are neither arbitrary nor purposeless. Also, the Second Circuit has held that "the Protocol affords ... no rights beyond those ... [existing] under our domestic law." *Bertrand v. Sava,* 684 F.2d at 218–19. *See also INS v. Stevic,* 467 U.S. 407, 104 S.Ct. 2489, 2500, 81 L.Ed.2d 321 n. 22 (1984) (the accession "did not work a substantial change in the law"). Indeed the President and the Senate believed that the Protocol was consistent in most respects with existing law and any differences could be reconciled by the Attorney General administratively without modification of statutory language. *Id.,* 104 S.Ct. at 2494–95. *See, e.g.,* S.Exec. K, 90th Cong., 2d Sess., *reprinted in* 63 Am.J. Int'l L. 123, 126 (1969). Moreover, based

upon the "legislative history" of the Convention, it appears that the regulations are not inconsistent with customary international law as represented by the practices of the countries debating the content of Article 31 and the Convention itself.

■ Although detention may continue for an extended period of time, it will end when petitioners have exhausted their remedies under our laws. "[D]etention is in no sense indefinite or permanent." *Bertrand v. Sava,* 684 F.2d at 207 n. 6. The President of the U.N. Refugee Conference observed with regard to such detention that "the situation in which the refugee found himself would be temporary, it would end when the State, after examining the appropriate files, recognized him as a *bona fide* refugee free from restrictions or, alternatively, as an undesirable." U.N. Refugee Conference, Summary Record of the Fourteenth Session, at 15 (July 10, 1951) (Remarks of Mr. Larsen) (U.N. Doc. A/Conf.2/SR.14). Indeed, pursuant to the Service's July 27, 1983 Guidelines, once it has been finally determined that they are excludable and that final orders of exclusion cannot be executed in a timely fashion, petitioners shall be released. For these reasons and the circumstances presented in this case, there has been no violation of customary international law.

### CONCLUSION

The petition for a writ of habeas corpus is denied. The regulations do not amount to an abuse of discretion on the part of the Attorney General and they are neither arbitrary nor purposeless. They are not inconsistent with the Refugee Act of 1980 nor do they violate any rights under the Fifth Amendments's Due Process Clause. The regulations are inconsistent with neither the United Nations Protocol Relating to the Status of Refugees nor customary international law.

Petitioners' plight does not leave the Court unmoved. But, the Constitution has vested authority over their status in the political branches of the government. It is to those authorities that they should direct their pleas for release.[16]

SO ORDERED

**16.** *See, e.g.,* Letter from Rep. Gary L. Ackerman to the Editor, N.Y. Times, Sept. 27, 1985 at A30, col. 3 ("Afghan Refugees Who Shouldn't Be Behind U.S. Bars").